MALDONADO, DEMANDANTE Y APELADA, *v.* HAMILTON, DEMANDADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Ponce en pleito sobre daños y perjuicios.

No. 2888.—Resuelto en julio 12, 1923.

DAÑOS Y PERJUICIOS POR NEGLIGENCIA—CAUSA DE ACCIÓN DE LA MADRE POR MUERTE DEL HIJO NATURAL.—Desde que fué promulgada la Ley 77 de 1921, una madre natural que dependía para su subsistencia de un hijo natural suyo, puede reclamar indemnización por la muerte de éste, sea menor o mayor de edad, cuando la muerte es causada por negligencia.

ID.—PRUEBA DEL CARÁCTER DE HEREDERA DE SU HIJO—*Self-serving Evidence.*—
Cuando la madre reclama por la muerte de su hijo, no es preciso que establezca su carácter de heredera acudiendo previamente a la Ley de Procedimientos Legales Especiales. Tal carácter de heredera puede alegarse y probarse en la misma acción de daños. Las declaraciones a tal fin prestadas y no impugnadas, por la madre y un tío del fallecido, son suficientes y no puede concluirse que constituyen *self-serving declarations.*

ID.—PRUEBA EN CASOS DE NEGLIGENCIA.—Cuando se reclama indemnización por negligencia el actor no sólo debe demostrar la negligencia del causante del daño, sino también establecer la relación causal entre la negligencia y el daño realizado.

ID.—NEGLIGENCIA CONTRIBUTORIA—PESO DE LA PRUEBA.—La obligación de probar la negligencia contributoria es una cuestión de defensa que incumbe al demandado.

ID.—NEGLIGENCIA; PRUEBA DE—LICENCIA PARA GUIAR AUTOMÓVILES.—La mera omisión del conductor de un automóvil a tener la licencia estatutoria al matar con su carro a un viandante en el camino, no le hará responsable por el daño causado, a menos que dicha omisión tuviera alguna relación con la causa de la muerte.

ID.—NEGLIGENCIA CONTRIBUTORIA—PRUEBA.—Analizada la prueba en este caso, *se resolvió:* que no sólo se desprende de la aportada por el demandado que el interfecto no fué cuidadoso o prudente al cruzar la carretera, sino que tampoco se deduce tal prudencia o cuidado de las circunstancias que concurrieron en el accidente. Por el contrario, aparece de la prueba que las condiciones en que se verificó el accidente fueron de tal naturaleza que si el interfecto hubiera ejercido el más ordinario cuidado, lo hubiera evitado.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. F. Manuel Toro.*

Abogado de la apelada: *Sr. D. Sepúlveda.*

EL JUEZ ASOCIADO SR. FRANCO SOTO, emitió la opinión del tribunal.

Esta es una acción en reclamación de daños y perjuicios.

El 15 de diciembre de 1921 el individuo Eleuterio Maldonado viajaba en una guagua en dirección de Santa Isabel a Ponce. La guagua se detuvo en el camino, situándose a su derecha, y al descender el citado Maldonado por detrás del vehículo y al tratar de cruzar la carretera, fué arrollado por un automóvil que caminaba en dirección opuesta a la guagua y sufrió graves lesiones, falleciendo poco después del accidente.

La demandante, alegando ser madre natural del inter-

fecto y en su carácter de única y universal heredera, interpuso la demanda de este caso, fundándose, además: que Maldonado fué arrollado de súbito por el automóvil que guiaba el propio demandado como dueño, quien carecía de licencia para guiar vehículos de motor en Puerto Rico y lo conducía entonces a una velocidad excesiva, sin tocar bocina ni ninguna otra señal de aviso; que el demandado pasó su carro casi pegado a la guagua y no tuvo el debido cuidado ni tomó las precauciones razonables para garantizar la seguridad de vidas, y que Maldonado, a consecuencia del accidente, resultó gravemente herido, falleciendo pocas horas después; y por último, que debido a la muerte de Eleuterio Maldonado, la demandante, que dependía de él exclusivamente en cuanto a su subsistencia, quedaba privada de recibir durante el resto de su vida su asistencia pecuniaria, experimentando además grandes dolores físicos y angustias morales.

El demandado admitió el hecho de haber ocurrido el accidente, pero alegando que se debió única y exclusivamente a la propia negligencia y descuido del interfecto.

El caso fué sometido a juicio; se practicó prueba por una y otra parte, y la corte inferior dictó sentencia concediendo a la demandante la suma de $3,000 en concepto de daños y perjuicios, y costas. La sentencia fué apelada y se señala la comisión de siete errores, de los cuales dos envuelven cuestiones de ley, y los restantes se refieren a hechos que la corte inferior estimó probados.

Primer error. La opinión de la corte inferior sienta que la demandante tiene reconocido su derecho a ejercitar esta acción conforme al artículo 61 del Código de Enjuiciamiento Civil, y el apelante sostiene que la enmienda del artículo 60 del propio cuerpo legal, tal como fué enmendado por la Ley núm. 77 de 20 de julio de 1921, se limita a las madres naturales cuando se trata de reclamar daños y perjuicios ocasionados a un hijo natural menor de edad,

es decir, que la enmienda solamente debe entenderse estrictamente en relación con el artículo 60 y, en cuanto al 61, debe seguir prevaleciendo la interpretación que esta Corte Suprema dió al citado artículo 60 en el caso de *Díaz* v. *P R. Railway, Light & Power Co.*, 21 D. P. R. 78.

Aparte de que la legislatura expresó su intención claramente al enmendar el artículo 60 del Código de Enjuiciamiento Civil, no creemos que fué necesario hacer la misma enmienda al subsiguiente artículo al tratar de los mayores de edad, toda vez que el texto del artículo 61, al hablar de herederos, tenía que referirse a lo ya establecido por nuestra legislación común o ley substantiva en materia de suce siones, y de acuerdo con el artículo 913 del Código Civil, tal como fué enmendado en marzo 9 de 1911, el padre o madre natural sucede al hijo natural reconocido.

Segundo error. Los precedentes de esta Corte Suprema son adversos a la cuestión planteada por el apelante. *Morales et al.* v. *Landrau et al.*, 15 D. P. R. 782. En casos como el presente, no es necesario establecer el carácter de herederos de un litigante teniendo que recurrir previamente a la Ley de procedimientos legales especiales, aprobada en marzo 9, 1905, pudiendo, por consiguiente, alegarse tal carácter en el mismo pleito y presentarse la evidencia pertinente para probarlo. En este extremo se ofreció prueba testifical y no fué controvertida, y no encontramos nada que nos indique que la corte inferior llegara a una conclusión errónea en tal sentido. Las declaraciones ofrecidas, de la propia demandante, alegando ser la madre del interfecto, y de un hermano de ésta, sin haber sido impugnadas, lejos de poderlas considerar como *self-serving declarations* son las que mejor podían servir de base a la conclusión a que llegó el juez inferior en ese extremo.

Tercero, sexto y séptimo errores. Estos tres errores podemos considerarlos conjuntamente. El primero discute la negligencia del demandado, que la corte inferior estimó pro-

bada; el segundo la negligencia contributiva del interfecto, que como defensa no fué apreciada; y el tercero se refiere a que la corte inferior incurrió en error al llegar a la conclusión de que el demandado ha sido negligente por la mera falta de no tener licencia para guiar automóviles en Puerto Rico. Estos errores así alegados tienden a demostrar que la corte inferior cometió manifiesto error al estimar y pesar la prueba que le fué presentada y bajo este aspecto estamos justificados para examinar dicha prueba y asegurarnos de la justicia del caso. Un principio que debemos tener por invariable en esta clase de acciones es que el actor no sólo debe demostrar la negligencia del causante del daño, sino también establecer la relación causal entre la negligencia y el daño realizado.

El accidente en este caso tuvo lugar ante varios testigos. El interfecto viajaba en una guagua acompañado por su concubina Cayetana Roche y un hijo de ésta; venían, además, el *chauffeur* y el conductor. Estos fueron los testigos presenciales y sus declaraciones son las que nos pueden esclarecer las circunstancias que rodearon el caso y determinar la verdad de los hechos tal como ocurrieron.

La demandante, para probar su caso en relación con el principio que citamos más arriba, se apoya: 1°., en la declaración de Cayetana Roche, concubina del interfecto, que le acompañaba en el *momento del accidente*; y 2°., en que el demandado carecía de licencia para manejar automóviles en Puerto Rico. Pero no encontramos que la declaración de Cayetana Roche por sí sola arroje luz suficiente sobre el hecho mismo del accidente para establecer claramente la negligencia del demandado. Ella declara que estaba de espaldas en el preciso momento de ocurrir el accidente y sus demás afirmaciones, por tanto, sólo pueden tener el efecto de meras conjeturas. Como parte esencial de su testimonio dicha testigo declaró:

"P.—¿Dice usted que usted encontró a su marido boca abajo, en esta posición en la carretera? R.—Sí, señor. P.—¿Cerca de la guagua? R.—Delante del auto. P.—¿Cerca de la guagua? R.— No, señor; la guagua quedaba así a poco trecho y él ahí; él le sirvió de calzo al auto. P.—¿Y paró el auto? R.—Sí, señor. P.— ¿De modo que el auto paró allí mismo? R.—Sí, señor. P.—¿Por dónde le dió el golpe el auto? R.—Lo único que pude fijarme fué el golpe que le dió aquí, porque en lo demás no me fijé. P.—¿La guagua venía de allá para acá por su derecha? R.—Sí, señor. P.—¿Usted se apeó de la guagua y se dirigió al otro lado del camino, cruzó la carretera? R.—Sí, señor. P.—¿El auto iba de Ponce para Guayama? Sí, señor. P.—¿Usted vió las luces del auto? R.—Las vine a ver cuando estaba ahí. P.—¿Entonces usted estaba de espaldas? R.—Sí, señor; estaba de espaldas. P.— ¿Usted lo que sintió fué el golpe? R.—Sí, señor. P.—¿Y por eso fué que se viró? R.—No, señor; yo viré cuando sentí el ruído. P.—¿Del auto que venía? R.—Sí, señor; porque estaba entretenida amarrando el lío para sacar unos chavos. P.—¿Y sintió el ruído del auto que venía? R.—Sí, señor; pero cuando venía al lado mío, que quise huir porque venía cerca. ¿Venía muy cerca? R.—Sí, señor; pegado, sí yo estaba así en la orilla. P.—¿Y dónde estaba el lío? R. —Delante de unos burros de arena que hay. P.—¿De los bordes de la cuneta, de la zanja de la carretera? R.—Sí, señor. P.—Y ahí fué donde le dió y su marido le servió de cuña al carro? R.—Si, señor; yo estaba soltando el lío y con el mismo golpe que quise virar ligero, me fuí de lado para encima del burro de arena."

Después de este deficiente testimonio, era lógico que los que podían ayudar a esclarecer los hechos eran el *chauffeur* y el conductor (cobrador) de la guagua. Estos testigos presenciales son los que afirman que el demandado caminaba su auto a poca velocidad y sostienen que avisaron al finado advirtiéndole el peligro del automóvil que se acercaba. Sus declaraciones tienen suma influencia en la decisión de este caso. El testigo Carlos Morales, *chauffeur* de la guagua, en parte dice:

"R.—Pues esa tarde veníamos del Pastillo para Ponce y en el puente del Inabón encontramos una señora, un niño y un señor, mandaron a parar la guagua y como es un vehículo de pasajeros,

paré, dijeron que los trajésemos no sabíamos con qué dirección y al llegar a la Calzada se desmontó la señora, desmontó un niño y unos paquetes que tenía y los puso al lado de la carretera así; el señor ese que venía en la guagua se quedó dándome una moneda de diez centavos para cobrar el pasaje, que como él me conocía luego después me daría algo más. * * * R.—Ofreciéndome una moneda de diez centavos, pero como el sitio era corto yo le dije: no vale nada; y me dijo: cójala; y le dije al cobrador: pues acéptala, y le aceptó la moneda, pero al salir del sitio donde estaba hablando con nosotros para desmontarse, se veía la luz del carro cerca de la guagua y se le advirtió: no se desmonte que viene un auto, y no vaciló en desmontarse y cruzar el camino. P.—¿Y qué le ocurrió al cruzar el camino? R.—El auto le dió un golpe. P.—¿Fué al tirarse él del carro? R.—Al desmontarse de la guagua, al lado izquierdo de la guagua. P.—¿Era obscuro o era de día? R.—Ya estaba obscuro. P.—¿Traía luces el carro? R.—Traía. P.—¿Buenas luces. R.—Buenas. P.—¿Se veían perfectamente? R.—Sí, señor. P.—¿Es camino recto ese? R.—Recto. P.—¿Usted oyó el automóvil, la bocina del automóvil? R.—Una bocina que apenas se oía, no era muy fuerte. P.—¿Pero usted oyó la bocina? R.—Sí, señor; parece que era un klaxon que mayormente no tenía fuerza. * * * P.—¿Pero llegó a correr? R.—Trató de correr al desmontarse para cruzar. P.—¿Qué fué lo que hizo él? R.—Al desmontarse salió corriendo para el otro lado, a avanzar a cruzar al automóvil.''

Y la declaración de Gonzalo Martínez, cobrador de la guagua, también, en la parte que consideramos más esencial, dice:

''P.—Sírvase exponer a la Hon. Corte detalladamente lo que usted sepa. R.—Nosotros veníamos del Pastillo para Ponce; más allá del puente Inabón nos mandó parar una gente que era un señor, una señora y una niña, nos paramos, se montaron y llegando a la Calzada mandaron parar, paramos, se desmontó la señora con la niña y la puso al lado de la carretera, después vino a buscar un lío que llevaban, cogió el lío y lo puso allá y se puso a esperar al señor, entonces el señor sacó una moneda de diez centavos para dárnosla, pero como era una cosa mínima le dijimos que no valía nada, pero tanto dijo: cojan eso, hasta que le cogí yo los diez centavos, entonces, al tiempo de él tirarse veo yo que viene el carro y

le dije: no se tire que ahí viene un carro, pero como él iba *esmandado* a tirarse, se tiró y vino el carro y le dió. P.—¿El carro traía luz? R.—Traía luz. P.—¿Se vieron las luces? R.—Sí. * * * P.—¿Cuando él hablaba con usted sobre los diez centavos, estaba de frente hacia donde venía el auto? R.—Sí, señor. P.—¿Lo podía ver perfectamente? R.—Lo podía ver. P.—¿Y cuando él se viró, se viró para bajar rápidamente? R.—Sí, señor. P.—¿Fué cuando ustedes le gritaron? R.—Sí, señor. P.—¿Cuando ustedes le gritaron fué cuando él se iba a bajar? R.—Sí, señor; cuando iba esmandado para abajo. P.—¿No cuando hablaba con usted? R.—No, señor. P.—¿Cuando él hablaba con usted se veía el resplandor del auto? R.—Sí, señor.''

Estas son las declaraciones que nos refieren cuáles fueron las actuaciones del finado en los precisos momentos de ocurrir el accidente, y ellas son las que nos dice que la imprevisión y descuido del interfecto hicieron de su muerte un accidente desgraciado. Es verdad que dichos testigos no podían asegurar que el interfecto oyera la advertencia que le hicieron del peligro que corría, y que uno de los testigos dice que se le hizo a gritos, pero ambos testigos divisaron el automóvil que venía a distancia, fijando su atención y a medida que se acercaba a la guagua, por la proyección de sus luces y el toque del *kláxon* oído por uno de ellos, y por tal razón se dieron perfecta cuenta del peligro avisándolo a Maldonado.

Pudiera ser que el interfecto no podía ejercitar su oído por el ruído que mantenía el motor de la guagua que permanecía funcionando, pero hay que presumir que de otro modo él tuvo que ejercitar su vista para ver lo que otros vieron, pues nada anormal se ha demostrado en cuanto a sus funciones visuales, pudiendo ver la claridad que proyectaban los faroles del auto alumbrando el camino y cuya intensidad tenía que aumentar en razón directa de la distancia en su acercamiento al sitio en que estaba parada la guagua. En este punto es que surge la discusión relativa a la negligencia contributoria que el apelante imputa al in-

terfecto y en donde hemos podido ver de un estudio de las autoridades y la jurisprudencia, que las controversias más violentas han girado sobre la cuestión de si el demandante debe probar que el mismo estaba libre de negligencia o si el demandado es quien lleva el peso de tener que probar que el accidente fué debido a la negligencia del deman- dante.

Sin embargo, ya esta corte se ha inclinado antes de ahora del lado de la regla que establece que la obligación de probar la negligencia contributoria incumbe al deman- dado, y conforme a este principio se dijo en el caso de *Ro- sado* v. *Ponce Railway and Light Co.*, 20 D. P. R. 584:

"En primer lugar, la obligación de probar la negligencia con- tributoria incumbe al demandado. Es una cuestión de defensa. Esta es la regla en la Corte Suprema de los Estados Unidos, en las ·Cortes Federales y en las cortes de la mayoría de los estados. Es una regla más sabia que aquella que impone la obligación al demandante y su sabiduría ha sido aprobada por Thompson en su obra sobre Negligencia, párrafo 366, y por otros autores."

Y en la misma doctrina se insiste en el caso de *Gonzá- lez* v. *Malgor, Luiña y Cía.*, 29 D. P. R. 106, diciéndose: "Y de acuerdo con la jurisprudencia establecida la negligencia contributoria del demandante es una defensa que incumbe alegar y probar al demandado."

La cuestión, sin embargo, de si un demandante ejerció el debido cuidado, aunque es en su forma una proposición afir- mativa, no significa necesariamente que había de probarse por un testimonio también afirmativo dirigido directamente a sostenerla. Eso mismo puede ser deducido de las circuns- tancias que han concurrido en el caso. Pero en el presente no sólo no se desprende de la prueba directa aportada por el demandado que el interfecto fué cuidadoso o prudente al cruzar la carretera, sino que tampoco se deduce tal pru- dencia o cuidado de las circunstancias que concurrieron en el accidente. Por el contrario, aparece de la prueba que

las condiciones en que se verificó el accidente fueron de tal naturaleza que si el interfecto hubiera ejercido el más ordinario cuidado, lo hubiera evitado. Si él no pudo oir el toque de bocina del auto que se acercaba, si también ocurrió lo mismo no oyendo el aviso del peligro que el *chauffeur* y el conductor le dieron debido al ruído que hacía el motor de la guagua, él tuvo que ver, sin embargo, dado la obscuridad de la noche, la proyección de las luces del automóvil que se acercaba, toda vez que según los testigos el interfecto estaba de frente a la dirección del carro que venía y más que nada porque dicho interfecto no bien pagó al conductor bajó precipitadamente y trató de cruzar la carretera corriendo. De todo eso se desprende que él se dió cuenta de que un automóvil iba a cruzar y él trató de ganar tiempo haciéndolo primero. No era posible suponer entonces que el demandado se diera cuenta de la inconsciencia del peligro en que incurría el interfecto al intentar atravesar la carretera en el instante en que el automóvil pasaba por el lado de la guagua, o de su inhabilidad, si la había, para evitarlo. No nos bastaría presumir que el instinto de conservación del interfecto sería el único motivo para decir que él obró con el debido cuidado, porque precisamente la impremeditación o inadvertencia en los casos que ocurren accidentes es la negación de aquella presunción. La prueba directa o las circunstancias son las que pueden darnos el conocimiento de los hechos tal como ocurrieron, y en este caso la impresión justa que recibe nuestra conciencia de juzgador al pasar sobre la prueba en conjunto es que el interfecto atravesó el camino con conocimiento del peligro y sin que diera tiempo al demandado para descubrirlo y evitarlo si prácticamente hubiera sido posible.

Parecería, sin embargo, que debiéramos haber prescindido de las conclusiones a que antes hemos llegado, tomando en consideración solamente el hecho alegado y no

controvertido de que el demandado carecía de licencia para manejar automóviles en Puerto Rico al tiempo del accidente, sosteniendo de este modo el apelado que tal omisión constituye negligencia *per se.* No hay duda de que el artículo 5, apartado (*a*), de la Ley núm. 75 "para reglamentar el uso de vehículos en Puerto Rico, etc.," aprobada en marzo 13, 1916, dispone la prohibición de manejar un vehículo de motor a ninguna persona que no haya obtenido una licencia para ello; y que asimismo, al disponer el apartado (*b*) los requisitos que se deben llenar para obtener la licencia, la ley ha tenido por objeto proteger y garantizar a las personas y a la propiedad contra accidentes. Pero el punto de vista que presenta el apelado no es concluyente por ser absoluto. El *consensus* de opinión en la jurisprudencia parece establecer el principio de que la operación de un automóvil sin licencia, en violación del estatuto, se considera prueba *prima facie* de negligencia, pero si de un accidente resultan daños, debe aparecer una relación de causa y efecto entre la violación de la ley en tal respecto y el daño causado.

En el caso de *Paz* v. *Bonet*, 30 D. P. R. 922, si bien otras fueron las circunstancias que determinaron la responsabilidad del demandado, se dijo, no obstante, aunque incidentalmente, lo siguiente:

"Pero si a esto se añade la falta de licencia para el manejo de un automóvil, circunstancia que aisladamente puede ser objeto de responsabilidad exigible en caso de accidente por la persona que sufre el daño, entonces tendríamos que además se alegaría *prima facie* determinada circunstancia que por sí constituiría negligencia haciendo responsable al demandado por los daños causados."

Aun en Massachusetts, que se aparta de la regla general de que el hecho de no hacerse la inscripción de un vehículo de motor no se considera como la causa próxima de un daño y que no afecta al derecho de reclamar, dicho

Estado sigue la regla general en casos que envuelven la falta de licencia de *chauffeur* consistente dicha regla en que la ausencia de tal licencia no puede imputarse como fundamento de responsabilidad en el caso de que la máquina cause un daño a otro viajero, a no ser que la falta de la licencia tenga relación con el accidente debido a la impericia del *chauffeur*. "Huddy on Automobiles," 5ª. edición, pág. 270.

La jurisprudencia es abundante en tal sentido. La cita que hace la misma apelada del caso de *Austin* v. *Rochester F. B. Co.,* 181 N. Y. Supp. 275 (1920), es una de las más saludables doctrinas que hemos podido examinar en ese respecto. En ese caso se dice:

"El objeto de la ley disponiendo que todo chauffeur debe tener una licencia era proteger al público contra los conductores incompetentes, y, por tanto, el dar empleo a un chauffeur que no tenía licencia se relaciona con el cuidado que el demandado debe ejercer hacia el demandante en el manejo de su carro. Si una compañía ferroviaria permitiera que un hombre que carecía de licencia de maquinista condujera un tren de pasajeros que chocó con otro tren, esto constituiría prueba de la falta de cuidado ordinario de parte de la compañía, para someter al jurado en cuanto a la cuestión de la responsabilidad de la misma. Si el médico encargado de un hospital privado permitiera a una persona sin licencia como cirujano, hacer una operación a un paciente que requería habilidad profesional dando por resultado una actuación errónea, sería prueba, hasta cierto punto, de falta del debido cuidado por su parte, que pudiera someterse al jurado acerca de la cuestión de su responsabilidad. La prueba no sería concluyente, y podría ser totalmente destruída por prueba de competencia; sin embargo, por sí sola, necesitaría una explicación y constituiría negligencia *prima facie*. De igual manera, el dejar de emplear un *chauffeur* con licencia en este caso, constituye en cierto modo prueba de negligencia, que puede anularse mediante otra prueba demostrativa de que no obstante que el chauffeur no tenía licencia era del todo competente y no responsable por el choque. No es una cuestión inmaterial como el no conseguir una licencia de automóvil, que no puede tener ninguna relación con la operación de

un carro. La infracción · de la ordenanza es, por consiguiente, prueba *prima facie* de negligencia que debe someterse al jurado en relación con los demás hechos del caso para determinar la responsabilidad última.''

''Ha habido considerable discusión en los casos respecto a la responsabilidad por daños causados a personas que corren por la carretera en un automóvil que no ha sido inscrito como lo exige la ley, y se ha tratado de establecer algunas distinciones sutiles. Es, por supuesto, un principio general de ley, que una persona que ejecuta un acto ilegal no queda por ello necesariamente sin la protección de la ley, y por el mero hecho de ser un infractor de la ley no está impedido de poder obtener una reparación por el daño que pueda ella sufrir, ni tampoco es responsable por el daño que pueda causarse a otra persona. Para ·que quede ella fuera del alcance de la ley a los fines de poder recobrar o que pueda dictarse sentencia contra ella, el acto ilegal debe tener relación con el daño causado.'' 2 R. C. L. 1208.

''La mera omisión del conductor de un automóvil a tener la licencia estatutoria al estropear su carro a un viandante en el camino, no le hará responsable por el daño causado, a menos que dicha omisión tuviera alguna relación con la causa de la lesión.'' (*Nancy H. Lindsay et al.* v. *Angelo Cecchi*, 35 R. L. A. (N. S. pág. 699).

¿Qué hecho o circunstancias demuestran la relación causal entre la omisión del demandado por su carencia de licencia y la muerte de Maldonado? La razón que nos da el apelado es que si dicho demandado hubiera obtenido su licencia hubiera recibido una copia de la Ley núm. 75 y actuado de acuerdo con sus disposiciones. Pero un razonamiento en tal forma no tendría más valor que una cuestión de principio y nos podía conducir al absurdo de que el mero hecho de tener licencia podía considerarse *a sensu contrario* como una presunción concluyente de haberse actuado con la debida diligencia cualquiera que fuera la forma en que ocurriera un accidente. Ni uno ni otro extremo presentan una buena doctrina, pues así como la mera tenencia de una licencia para guiar un automóvil no hace inmune al que causa

un daño en caso de accidente, el hecho contrario, por falta de licencia, no implicaría por sí solo negligencia y sí más bien negligencia *prima facie,* sujeta a prueba en contrario o a las resultas de los demás hechos o inferencias que puedan demostrar la relación causal de la falta de licencia y el accidente.  En conexión con esto, y tomando en consideración la prueba en este caso, nada nos indica que el accidente hubiera cambiado en su forma ni en sus efectos, asumiendo que el demandado estuviera provisto de su licencia.  La prueba no nos ha convencido que ninguna de las demás regulaciones de la ley para manejar automóviles fué quebrantada.  El hecho de haber podido parar el automóvil el demandado casi en el acto del choque, sirviéndole "de calzo" el interfecto, según expresión de la testigo Cayetana Roche, evidencia palmariamente la poca velocidad del carro.  La única duda es si realmente el demandado tocó bocina.  Pero este extremo lo afirma el *chauffeur* de la guagua y así corrobora la afirmación del demandado de que dió el correspondiente toque de bocina avisando la proximidad de su carro;  y asimismo, puede quedar explicado el haber parado el automóvil acercándose a la guagua por el hecho de existir al lado opuesto unos montones de arena en donde junto a ellos estaba Cayetana Roche atando unos "líos" y de espaldas al sitio del suceso.

Todos esos detalles que podemos considerar como eslabones que entrelazan la cadena de los hechos ocurridos, no establecen presunción alguna que implique la incompetencia del demandado para manejar su automóvil, ni por tanto la relación causal de su falta de licencia con el accidente. Nuestra convicción es más bien que tales detalles corroboran las manifestaciones del demandado, quien declara que es un ingeniero, con experiencia en el manejo de automóviles por haber sido autorizado en otros estados.

Por las razones expuestas, la sentencia debe ser revo-

cada y dictarse otra declarando sin lugar la demanda, sin especial condena de costas.

> *Revocada la sentencia apelada y sin lugar la demanda, sin especial condena de costas.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Wolf, Aldrey y Hutchison.