Dolores Eulogia López Vda. de López demandante y apelante, *v.* Félix Rexach y The Maryland Casualty Co., demandados y apelados.

Juan López Ortega, demandante y apelante, *v.* Félix Rexach y The Maryland Casualty Co., demandados y apelados.

Núms. 8079 y 8080.—*Sometidos:* Febrero 7, 1941. *Resueltos:* Febrero 28, 1941.

144

*Brown, González & Newsom* y *E. Córdova Díaz,* abogados de los apelantes; *Cayetano Coll y Cuchí* y *Enrique Igaravídez,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

El juicio de estos casos fué celebrado ante el entonces juez de la corte inferior Hon. Pablo Berga, y habiendo éste fallecido antes de dictar sentencia, fueron resueltos por el juez Hon. Marcelino Romany a virtud de una transcripción de las alegaciones y de la prueba sometídale por estipulación de las partes.

Se alega sustancialmente en una y otra demanda que el demandado Félix Rexach, el 24 de octubre de 1938, era dueño del camión H-348, asegurado con la codemandada The Mary-

land Casualty Co., y que en la indicada fecha el referido camión, por culpa y negligencia de su chófer Jacinto Nevárez Landrón, empleado del demandado Rexach, arrolló a José López, esposo e hijo, respectivamente, de los demandantes, causándole graves heridas y contusiones a consecuencia de las cuales falleció en las primeras horas del día siguiente. La negligencia del chófer consistió, según alegan los demandantes, entre otras cosas, en conducir el camión a una velocidad exagerada e ilegal, no tener frenos adecuados, llevar una carga excesiva, haber lanzado dicho camión hacia el lado izquierdo de la carretera, y por último, no haber tomado las precauciones necesarias para evitar daños a las personas que se encontraban o transitaban por el sitio donde ocurrió el accidente.

El demandado Rexach admite ser el dueño del camión y que dicho vehículo era entonces guiado por su empleado Jacinto Nevárez, actuando dentro del radio de sus atribuciones, pero niega entre otras cosas los actos de negligencia alegados por los demandantes. Alegan ambos demandados que la causa próxima del accidente fué la negligencia del interfecto al cruzar la carretera de Sur a Norte en la forma en que lo hizo; interponen además la defensa de negligencia contribuyente, y en cuanto al padre demandante concierne, alegan también que en la hipótesis de que fuese padre del interfecto—cosa que niegan—dicho demandante no tenía derecho a recibir alimentos de su citado hijo, ni había éste contraído obligación alguna de suministrárselos.

La codemandada The Maryland Casualty Co. admitió haber expedido la póliza y aceptó su responsabilidad bajo la misma hasta la cantidad de $5,000 en caso de que se resolviese en definitiva que el demandado Rexach es responsable de los daños reclamados.

El juez inferior desestimó ambas demandas por el siguiente fundamento, que expresa así al final de su opinión:

"No queremos que se nos entienda, sin embargo, que consideramos al conductor del *truck* como no culpable de negligencia. Por el con-

trario, el demandante llenó cumplidamente su obligación y probó, no ya con preponderancia de la prueba, sino más allá de duda razonable, los cargos de que el truck era conducido a una velocidad exagerada e ilegal, que no tenía frenos adecuados y que llevaba una carga excesiva; y creemos más, que esa negligencia del conductor del camión contribuyó a la muerte del infortunado Sargento López. Pero esa negligencia no fué la única que causó el accidente; la negligencia del hoy interfecto también contribuyó grandemente y sin ella no hubiera ocurrido el accidente; y es por esta última razón que declaramos sin lugar la demanda en este caso.''

◼ Como el juez sentenciador no vió ni oyó declarar a los testigos, nos encontramos en idénticas condiciones a él en lo que a la apreciación de la prueba respecta. *Delgado* v. *Díaz,* 30 D.P.R. 120. Así pues, haremos primero una descripción del accidente de acuerdo con la versión de una y otra parte, y procederemos después a considerar la prueba que en apoyo de sus respectivas teorías presentaron cada una de ellas, para determinar entonces si estuvo o no justificado el juez inferior al negarse a dar crédito a los testigos de los demandantes por ser sus declaraciones, según dicho juez, contrarias a los hechos físicos probados.

◼ En el costado Norte de la Avenida Muñoz Rivera, que es la prolongación de la Calle Salvador Bráu de esta ciudad, y frente a los cuarteles y garages de la Guardia Nacional, existen dos casas construídas por el Ejército de los Estados Unidos para residencia de militares. En una de ellas, la más próxima a Santurce, residía el sargento José López el día del accidente. La avenida en ese sitio mide 36 pies de ancho, de encintado a encintado, y desde el sitio en que ocurrió el accidente hacia Santurce, la avenida es recta en una extensión de unos 200 metros, sin que nada interrumpa la visión desde esa distancia. Al lado Norte de la avenida no existen calles, pues consiste dicho lado en una faja de terreno bastante estrecha, que desde una considerable elevación desciende abruptamente al mar; pero al lado Sur existen varias calles cortas que la conectan con la Avenida Ponce de León. El día del accidente, alrededor de la 1:30 de la

tarde, el sargento López venía por dicha avenida desde San Juan para su casa en una motocicleta con *side-car,* por su derecha y a moderada velocidad. Poco antes de llegar a los terrenos donde enclava el edificio de la Guardia Nacional, fué alcanzado por un automóvil que marchaba en su misma dirección. Se echó López más hacia su derecha, dando paso así al automóvil, continuando este último hasta cruzarse casi al final de la recta de que hemos hablado, con el camión H-348, que a la sazón venía por la avenida de Santurce hacia San Juan. No existe controversia en cuanto a los hechos que acabamos de narrar. Según los testigos de los demandantes, al aproximarse frente a su casa, el sargento López trató de atravesar la avenida de Sur a Norte, pero observando que en dirección contraria se aproximaba el camión, paró la motocicleta a su derecha, a una distancia de 13 pies 10 pulgadas del encintado al Sur de la avenida, y el camión, que venía a una velocidad que se calcula en 50 kilómetros por hora, hizo entonces un zigzag hacia su derecha primero y hacia la izquierda inmediatamente después, continuando en esa dirección, yendo a chocar con la motocicleta y lanzándola por el aire a unos cuantos pies de distancia, cayendo ésta con las ruedas hacia arriba, lanzando al mismo tiempo al sargento junto al encintado Sur de la avenida, arrollándolo, saltando el truck por encima del encintado, quedando entonces sus cuatro ruedas sobre la acera, deteniéndose sobre una estrecha faja de tierra que separa el encintado Sur de la Avenida de las paredes posteriores de los garages de la Guardia Nacional, al enterrársele una de sus ruedas traseras casi hasta el eje de la misma, produciendo ciertos desconchados en la referida pared.

Según los testigos de los demandados, que lo fueron el chófer Nevárez y los peones del camión, Zenón de Jesús y Julio Vega, el camión marchaba por su derecha a una velocidad de 25 ó 30 kilómetros por hora, como a dos pies del encintado Norte. Vieron la motocicleta cuando se hallaban a 20 pies de ella, declarando todos que venía por su derecha

como a 2 ó 3 pies del encintado y continuando así hasta que al hallarse como a 9 pies del camión, súbitamente viró hacia la izquierda. Tocó *klaxon* el chófer, aplicó los frenos y desvió hacia su izquierda para dar paso a la motocicleta que había llegado a una distancia de 5 pies del encintado Norte; pero el ciclista se confundió y en vez de seguir en la dirección que llevaba, volvió a su derecha, chocando entonces la parte delantera izquierda de la motocicleta con la parte delantera derecha del camión, ocurriendo el choque, según el chófer, a 4 pies del centro de la carretera hacia la derecha del truck, o sea a 14 pies del encintado Norte y no a 22 pies 10 pulgadas como se determinó por las huellas que quedaron en el pavimento.

Conviene aquí consignar que inmediatamente después del accidente se trasladaron al sitio los Capitanes Francis H. Boos y Philip R. Dwyer, así como el Teniente Samuel Arthur Daniels; que como a las 2:30 de la tarde, después de haber observado el sitio del suceso, los Capitanes Boos y Dwyer se trasladaron al Cuartel de la Policía en Puerta de Tierra, encontrando allí al chófer Nevárez Landrón. El Capitán Boos, en presencia de su compañero y del sargento Correa, de la Policía Insular, preguntó en español a Nevárez como había sucedido el accidente, y no contestándole éste, volvió a preguntarle, interpretándole el sargento Correa, contestando entonces Nevárez, después de encoger los hombros: "Estaba andando muy ligero." La declaración del Capitán Boos fué corroborada en todas sus partes por la del Capitán Dwyer, quien como su compañero, habla español.

Declaró el Teniente Daniels como experto en el funcionamiento de vehículos de motor. Para calificar como tal experto, declaró que es graduado de la Academia Militar de West Point y que desde septiembre de 1937 a junio de 1938 tomó un curso en Army Infantry School, Tank Section, en Fort Benning, Georgia; que todos los oficiales que toman ese curso en dicha institución dedican un año completo al estudio de la fabricación de automóviles, su funcionamiento, y modo de cuidarlos y mantenerlos en buenas condiciones;

que a la terminación de esos estudios, son enviados a las distintas organizaciones del Ejército como especialistas en esa rama y que desde que él se graduó en dicha escuela actúa como oficial especialista en el Puesto de San Juan, en la Compañía de Servicio del Ejército (*Service Company*). Declaró además este testigo que se ocupa, entre otras cosas, del cuidado y limpieza de los vehículos, poniéndolos en buenas condiciones, reparándolos en caso de accidente o cuando se desajustan. Una vez que calificó como experto, declaró que inmediatamente después del accidente se trasladó a aquel sitio por ser ésa su obligación de acuerdo con la ley, y luego de describir la posición y forma en que quedaron los vehículos, determinó el sitio exacto en que ocurrió el choque, observando la huella que dejaron los vehículos al venir en contacto; que dicho sitio estaba, según la medida que tomó, a 13 pies 10 pulgadas del encintado Sur de la avenida. Observó además que del sitio del impacto a aquél en que vinieron a quedar las ruedas delanteras del camión después del accidente, había una distancia de 86 pies; que el peso del truck vacío era de 6,000 libras y que cargado no estaba autorizado para exceder de un peso total de 12,000 libras; que la velocidad máxima autorizada para dicho vehículo era de 12 millas por hora y por estudios que hizo de las huellas que dejó en la carretera, sitio donde paró finalmente, etc., pudo asegurar que el camión, en el momento del accidente, marchaba a una velocidad no menor de 50 kilómetros por hora. Declaró además dicho testigo que en compañía del experto de los demandados, Sr. Pascual Hernández, condujo el camión con la carga que traía a la romana de la corporación Porto Rico Coal Co. y dió un peso total de 16,330 libras, demostrando así que traía un exceso de peso de 3,300 libras, o sea un peso total igual al 150 por ciento de aquél para el cual había sido diseñado. Probó también los frenos, guiando el camión el perito de los demandados, primero a una velocidad de 20 kilómetros por hora—logrando parar solamente a una distancia de 36 pies desde el sitio en que se aplicaron los frenos—, y luego, a

una velocidad de 40 kilómetros, paró a una distancia de 104 pies. Tanto el perito de los demandantes como el de los demandados aseguraron que el exceso de peso en un vehículo de motor afecta no solamente los frenos sino todo su funcionamiento. Es evidente que los demandantes probaron concluyentemente la negligencia crasa con que era conducido dicho camión, y así lo estimó la corte sentenciadora, agregando "que esa negligencia del conductor del camión contribuyó a la muerte del infortunado sargento López", pero la corte inferior relevó de responsabilidad a los demandados por estimar que la negligencia del interfecto "contribuyó grandemente y *sin ella no hubiera ocurrido el accidente.*" Llegó a esta conclusión porque dió crédito a la versión de los demandados sobre la forma en que ocurrió el accidente, y desechó la de los testigos presenciales de los demandantes por estimar que sus declaraciones eran contrarias a los hechos físicos probados. Veamos si esta apreciación es correcta.

Dice el juez sentenciador:

"No nos merecen crédito los testigos del demandante que dicen presenciaron el accidente. Sus declaraciones están abiertamente en pugna con los hechos físicos demostrados en el juicio... De acuerdo con ellos es claro para nosotros que el impacto ocurrió a 13 pies 10 pulgadas del encintado izquierdo yendo de Santurce para San Juan; sin embargo, todos los testigos del demandante colocan al sargento, en el momento del choque, a 5 pies del referido encintado; Gregorio Ríos fué aun más lejos diciendo que el choque ocurrió después que el truck subió al encintado.".

Sobre este particular declararon los testigos de los demandantes:

*Remigio Usera:*

"P. ¿Por dónde venía la motocicleta cuando él la chocó?
"R. Él tenía (se refiere al ciclista) por lo menos cinco pies del encintado hacia la carretera." (T. de E., 76.)

*Francisco Muriel:*

"P. Pero antes del golpe, ¿usted vió dónde estaba la motocicleta?
"R. Iba por su derecha de aquí para allá.

"P. Y cuando le dió el golpe, ¿dónde estaba la motocicleta?

"R. Está en su derecha.

"P. Yo le muestro una fotografía—*exhibit* 11 de la parte demandante—le pregunto si quedó en esa forma después del choque.

"R. Sí, tal como está ahí y estaba en el centro de la carretera.

"Sr. Coll: ¿La motocicleta estaba en el centro de la carretera?

"R. Después del accidente quedó así.

"P. ¿Después del accidente la motocicleta quedó en el centro?

"R. Sí, señor." (T. de E., 89–90.)

*Rogelio Mercado:*

"P. Sí, pero antes del choque, ¿dónde estaban la motocicleta y el ciclista?

"R. Venía por su derecha.

"P. ¿Pegado, o más hacia el centro de la carretera?

"R. Por la derecha.

"P. ¿Usted está seguro?

"R. Sí, señor." (T. de E., 99.)

*Remigio Ríos:*

"P. ¿Y a qué distancia se quedó parado el sargento del encintado de la derecha de la carretera?

"R. Como a dos o tres pies.

"P. ¿En ese sitio fué que se produjo el choque?

"R. Sí, señor." (T. de E., 105–106.)

*Francisco Roura:*

"P. Ahora, ¿dónde quedó parada la motocicleta con el sargento?

"R. Más a su derecha que al centro de la carretera.

"P. ¿Pero estaba parada?

"R. Sí, señor." (T. de E., 109–110.)

Éstos son los únicos testigos presenciales que declararon por parte de los demandantes. No podemos convenir con el juez sentenciador en cuanto asegura que deben descartarse sus testimonios porque "todos los testigos del demandante colocan al sargento en el momento del choque a cinco pies del referido encintado (el Sur)."

Todos, con excepción de Remigio Usera y Gregorio Ríos, declararon que el choque ocurrió a la derecha del sargento, sin precisar distancias, lo cual es perfectamente congruente con el hecho físico a que se refirió la corte. Si la carretera

tiene 36 pies de ancho en ese sitio, sobre lo cual no existe controversia, su centro estará a 18 pies de uno y otro encintado. Habiendo ocurrido el impacto en un sitio a 13 pies 10 pulgadas del encintado Sur, están en lo cierto los testigos del demandante al asegurar que al ocurrir el choque el sargento se hallaba en su derecha.

En cuanto al testigo Remigio Usera, como puede verse por su declaración, no asegura que el sargento estuviera a 5 pies del encintado, pues lo que él manifestó fué que ''él tenía *por lo menos* 5 pies del encintado hacia la carretera.'' Es un cálculo que podrá ser equivocado, pero no es motivo para rechazar su declaración, pues de ella se desprende que él no había tomado medidas, y todos sabemos cuán inexactos son los testigos ignorantes en lo que se refiere a calcular tiempo y distancias. Por otra parte, si se considera que el ancho de la motocicleta era de 4 pies, se verá entonces que el sitio donde estaba el sargento, según este testigo, distaba 9 pies del encintado Sur. El error de cálculo es, pues, de 4 pies solamente. Más o menos lo mismo puede decirse con respecto a la declaración de Gregorio Ríos.

''Hay que tener en cuenta que un accidente de esta naturaleza se desarrolla con inusitada rapidez, provocando la consiguiente excitación, y que no es de esperarse, ni debe exigirse, de un testigo en estas condiciones que fije con exactitud matemática hechos y detalles que fueron objeto de una festinada observación. Cuando estos hechos, así relatados, han podido ocurrir y desarrollarse en la forma expuesta por el testigo, su grado de veracidad no debe depender de una falta de precisión al fijar la distancia, o de una ligera variación en la apreciación de la misma.'' *López* v. *American Railroad Co. of P. R.*, 50 D.P.R. 1, 18–19.

''Hemos leído cuidadosamente la transcripción de evidencia y no encontramos nada en las declaraciones de los testigos del demandante que pueda hacer dudar de su veracidad. Sus contestaciones son categóricas, no hay evasivas ni contradicciones, y si bien existen ciertas discrepancias entre ellos en cuanto a la hora exacta en que ocurrió el accidente, el ancho de la carretera, la distancia a que se hallaba Navarro del paso a nivel, etc., etc., tales discrepancias, lejos de debi-

litar la fuerza probatoria de sus testimonios, los fortalecen, pues demuestran que la prueba del demandante no había sido amañada.

"Es muy conocido de todo estudiante de Evidencia el clásico experimento del grupo de personas que presencia un accidente y que luego, al relatarlo, no hay dos de los observadores que estén estrictamente de acuerdo en todos sus detalles. Además, es de conocimiento general la inexacta noción que del tiempo y del espacio corrientemente tienen los testigos ignorantes, no debiendo tampoco perderse de vista la circunstancia de que en este caso los testigos declararon tres años después de haber ocurrido el accidente." *Navarro v. Compañía Azucarera "El Ejemplo"*, 53 D.P.R. 726, 730–731.

Volvamos ahora a la declaración del testigo Ríos para determinar si está justificado el juez inferior en aseverar que ese testigo "fué aún más lejos, diciendo que el choque ocurrió *después que el truck subió al encintado.*"

"P. ¿Cómo caminaba ese truck?

"R. A una velocidad exagerada, y en ese mismo momento venía el sargento López en su motocicleta de San Juan para Santurce, para su casa. Él venía por su derecha. Venía a una velocidad mínima y en el momento en que venía el truck tan ligero, el truck venía más a la izquierda de él que era la derecha del sargento, y en ese mismo momento el truck, como venía tan ligero el truck, dió un zigzag, se trepó por encima del encintado del borde y se fué contra la pared de la Guardia Nacional, *y en ese mismo momento le dió con el tapalodo derecho a la motocicleta que la volcó* y al sargento lo tiró a su derecha." (T. de E., 100–101.)

"P. ¿A qué distancia se quedó parado el sargento del encintado derecho de la carretera?

"R. Como a dos o tres pies.

"P. ¿Y en ese sitio fué que se produjo el choque?

"R. Sí, señor." (T. de E., 105–106.)

Examinada cuidadosa y fríamente la declaración de este testigo, no es posible darle la interpretación que le dió el juez inferior. De lo transcrito se advierte lo inexacto que es en su expresión, pero asegurando como asegura que el accidente ocurrió en el sitio donde se hallaba el sargento— que según él distaba 2 ó 3 pies del encintado—, la frase "y en ese momento le dió con el tapalodo derecho a la motoci-

cleta, etc.'', no puede referirse al momento en que se había trepado el truck sobre la acera, puesto que allí no estaba el sargento, teniendo que ocurrir el impacto necesariamente antes de subir al encintado.

La que nos parece inverosímil es la teoría de los demandados. El chófer Nevárez Landrón, testigo estrella de los demandados, declaró que él venía a 25 ó 30 kilómetros por hora, por su derecha, y que el sargento también venía por su derecha. Que cuando el camión y la motocicleta se hallaban a unos 15 ó 20 pies de separación, vió que el sargento súbitamente viró hacia su izquierda, llegando hasta unos 5 pies del encintado Norte; que entonces Nevárez desvió hacia su izquierda, pero el ciclista se confundió y volvió entonces hacia su derecha, viniendo a chocar con el camión como a 4 pies del centro de la carretera, hacia la derecha del chófer. Asumiendo a los efectos del argumento que el camión viniese a 25 ó 30 kilómetros por hora, según declaró Nevárez, en un minuto debió caminar 500 metros, y en un segundo 8⅔ metros, o sea alrededor de 28 pies. Esa distancia fácilmente pudo ser cubierta por el camión en menos de un segundo. ¿Cómo es posible entonces que el ciclista en menos de un segundo pudiese atravesar la carretera hasta llegar a 5 pies del encintado Norte y dar la vuelta hacia atrás, especialmente en una motocicleta con *side-car,* para llegar a 4 pies del centro de la carretera, donde según el chófer ocurrió el impacto? Otro testigo de los demandados, Julio Vega, fué más lejos aún al declarar que cuando la distancia entre el camión y la motocicleta era de tres varas, o sea 9 pies, la motocicleta desvió hacia su izquierda y luego volvió a su derecha para chocar con el camión. (T. de E., 158.) En el examen de repreguntas, este testigo, exagerando más, declaró:

''P. Pero el primer movimiento que hizo la motocicleta hacia la derecha de ustedes, ¿fué cuando ustedes estaban a 3 varas?

''R. No, señor, cuando la vimos fué a tres varas, *pero cuando cruzó estaba más cerca.''* (T. de E., 160–161.)

El otro testigo de los demandados, Zenón de Jesús, declaró como el chófer que cuando vió la motocicleta, marchaba ésta como a 6 pies del encintado Sur y a 20 pies de distancia del truck. (T. de E., 130.)

Parece haber impresionado a la corte fuertemente a favor de los demandados el mero hecho de que la parte izquierda de la motocicleta chocase con el frente derecho del truck, pero a nuestro juicio esa circunstancia no es decisiva en el presente caso, pues en la confusión del momento, al percatarse López del peligro inminente en que se hallaba al ver venir sobre él el camión, no sabemos qué movimiento pudo hacer en aquel instante, sin que desgraciadamente para los demandantes pueda él darnos luz alguna sobre este particular.

No basta que el demandado alegue la negligencia contribuyente. Es preciso también que la pruebe por la preponderancia de la evidencia, a menos que tal negligencia pueda inferirse de la prueba del demandante. *Rosado* v. *Ponce Ry. L. Co.,* 20 D.P.R. 564, 584; *González* v. *Malgor, Luiña & Co.,* 29 D.P.R. 105; *Maldonado* v. *Hamilton,* 32 D.P.R. 224, y *Rush* v. *Lagomarsino* (Cal. 1925) 237 P. 1066.

No dudamos que hubiera sido más prudente el interfecto si se hubiera mantenido junto al costado derecho de la carretera hasta que pasase el camión, y hasta podría concederse que fué negligente al no hacerlo así, pero esa negligencia de su parte no afecta el resultado del caso, ya que la mera negligencia por parte del interfecto no priva a los demandantes del derecho a indemnización a menos que ella haya contribuído al accidente como causa próxima del mismo. *Rush* v. *Lagomarsino,* supra.

A nuestro juicio la conducta del sargento López sólo proporcionó una condición dentro de la cual se desarrolló el acto negligente del chófer del demandado Rexach, acto negligente que en nuestra opinión fué la causa próxima del accidente. *Colón* v. *Shell Co. (P.R.) Ltd.,* 55 D.P.R. 592, 618.

En el caso de *Delgado* v. *Díaz,* supra, se dijo por este tribunal:

"La prueba así presentada es robusta y convincente en cuanto a que el chófer de la apelada iba con una velocidad muy exagerada; que los niños a quienes el chófer trató de no golpear pudieron ser vistos claramente, y se infiere necesariamente que si al verlos hubiera reducido su velocidad en vez de tratar de no chocar con ellos, probablemente el accidente no hubiera ocurrido. Cuando alguien aparece en el camino frente a un chófer, su deber es controlar de tal modo su máquina como lo exijan las circunstancias. La ley, como ha sido expuesta en el caso de *El Pueblo* v. *Blandford,* 23 D.P.R. 625, es de aplicación. Un chófer no tiene ningún derecho a confiar en su habilidad para poder pasar. La prueba tiende a demostrar que no solamente hubo exagerada velocidad, sino que ésta excedía el límite fijado. Por tanto, debe revocarse la sentencia y dictarse otra a favor del demandante."

Véanse al mismo efecto *Welch* v. *Sink* (Cal. 1937), 74 P. (2) 833, 835; *Brush* v. *Kurstin* (Cal. 1936), 53 P. (2) 777.

Si en el caso de autos el chófer Nevárez no hubiera conducido su automóvil a una velocidad tan exagerada de acuerdo con las circunstancias, si sus frenos hubieran estado en buenas condiciones de funcionamiento, no llevando una carga tan en exceso de la que podía llevar el vehículo, hubiera podido controlarlo a tiempo, reducir la velocidad, y hasta pararlo sin necesidad de tener que optar por la peligrosa maniobra a que su propio descuido y negligencia le obligaron a recurrir. Considerando como consideramos que la causa próxima de la muerte del sargento López fué la negligencia de Nevárez, sin que se haya probado por la preponderancia de la prueba negligencia contribuyente por parte del interfecto, pasemos ahora a determinar la cuantía de los daños, resolviendo antes si como alegan los demandados, el demandante Juan López Ortega no tiene causa de acción contra los demandados al ser privado de los alimentos que de su referido hijo recibía.

En su demanda alega Juan López Ortega que el interfecto le suministraba dinero para su sostenimiento, habitación, vestidos, y asistencia médica en caso de enfermedad, y de la prueba no contradicha de los demandantes resultó que Juan Ortega era el padre legítimo del interfecto; que en mayo de 1939 el referido padre cumpliría 69 años; que es muy

pobre y que aunque tiene otros hijos, ninguno de ellos está en condiciones de ayudarlo por hallarse todos en muy mala posición económica; que el demandante hacía tiempo se hallaba sin trabajo y que el interfecto le pasaba $18 ó $20 mensuales y además le daba ropas, zapatos y sombreros, y si se enfermaba le conseguía una cama en el Hospital Militar. En tales circunstancias, es claro el derecho del demandante a recibir indemnización por la pérdida de alimentos conforme se resolvió en el caso de *Ruberté* v. *American R. R. Co.,* 52 D.P.R. 471.

El sargento López, en la fecha de su muerte, a juzgar por la edad del padre, no debió tener más de cincuenta años, y era un hombre fuerte y saludable según declaró el Teniente Coronel Tamraz, del Cuerpo Médico del Ejército de los Estados Unidos, quien lo asistió al ser llevado al Hospital Militar después del accidente, y lo conocía por algún tiempo antes de esa fecha; que el rango del interfecto era el de sargento primero, con un sueldo de $105 mensuales. Su esposa, en el año 1939, tenía 31 años de edad, no tuvieron hijos, hacía 10 años que habían contraído matrimonio, y a su fallecimiento el sargento no dejó bienes ni tampoco los poseía su referida esposa.

*Procede, por lo expuesto, declarar con lugar ambos recursos y revocar las sentencias apeladas, dictando en su lugar las que debió haber dictado la corte sentenciadora, a saber: en el caso número 8079, que es el seguido por la esposa, condenar a los demandados solidariamente a pagar a la demandante la cantidad de $3,500, más las costas y $150 por concepto de honorarios de abogado; y en el número 8080, que es el seguido por el padre del interfecto, condenar a los demandados solidariamente a pagar al demandante la cantidad de $1,500, más las costas y $150 para honorarios de abogado, entendiéndose que las obligaciones impuestas por dichas sentencias a la codemandada The Maryland Casualty Co. no excederán en ningún caso de $3,500 y $1,500 respectivamente.*

El Juez Asociado Sr. Todd, Jr., no intervino.