SANDALIO LÓPEZ, demandante y apelado, *v.* THE AMERICAN RAILROAD COMPANY OF PORTO RICO, demandada y apelante.

Núm. 6858.—*Sometido:* Enero 28, 1936. *Resuelto:* Mayo 22, 1936.

4

*M. Acosta Velarde,* abogado de la apelante; *García Méndez & García Méndez,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Allá por el 24 de octubre de 1932, en un sitio en que la vía férrea cruza la carretera pública núm. 2, cerca del pueblo de Aguadilla, ocurrió una colisión entre un tren de la American Railroad Co. of Porto Rico, que caminaba de Aguadilla para Isabela, y un camión, propiedad de Angel Cabán Santiago, guiado por el *chauffeur* Arturo Vega, que se dirigía de Isabela a Aguadilla. A consecuencias de las heridas recibidas en este accidente falleció Juan López, recibió lesiones Angel Cabán Santiago, y sufrió averías el camión de su propiedad. Sandalio López, padre del interfecto, y Angel Cabán Santiago, dueño del camión, han demandado separadamente a la American Railroad Co. of Porto Rico en reclamación de daños y perjuicios que alegan haber sufrido, el primero con motivo de la muerte del hijo, y el segundo por las lesiones recibidas y las averías ocasionadas al camión de su propiedad.

En la corte inferior, por estipulación de las partes, la evidencia presentada en el caso de Sandalio López en cuanto a la forma y manera de la ocurrencia del accidente sirvió para decidir el caso de Angel Cabán Santiago, quien presentó además prueba testifical para demostrar los daños que le fueron ocasionados.

Se alega en la demanda que el accidente se debió a la negligencia de la demandada, y que esta negligencia consistió en haberse bajado las barreras que existían en el cruce donde ocurrió el accidente después que el *truck* había penetrado en el paso a nivel, cayendo dichas barreras encima del *truck*, en el hecho de que el tren no tocó pito ni campana ni dió señal de alarma alguna desde mucho antes de llegar al cruce mencionado, y en no haber utilizado la guardabarreras una bandera para dar aviso de la aproximación del tren, como así se acostumbraba.

Primeramente solicitó la demandada la eliminación de unos cuantos particulares de la demanda que la corte se negó a eliminar. Luego presentó excepciones a la demanda, que fueron declaradas sin lugar. Y últimamente radicó su contestación, negando los hechos esenciales de la demanda y alegando que si en el accidente ocurrido medió culpa o negligencia alguna de parte de la demandada o de sus empleados, también medió como causa próxima e inmediata del accidente la negligencia de Juan López y Angel Cabán Santiago, y de la persona que guiaba el *truck*.

En la acción incoada por Sandalio López la corte inferior dictó sentencia declarando con lugar la demanda y condenando a la demandada a pagar al demandante la suma de $1,500 por concepto de daños y perjuicios, con las costas, gastos y honorarios de abogado.

En el caso de Angel Cabán Santiago la sentencia concede al demandante la cantidad de $687.47, por concepto de daños y perjuicios, más las costas, gastos y honorarios de abogado, haciendo constar la corte que en su día tendría en cuenta que

ambos casos fueron objeto de una sola vista para fijar los honorarios de abogado.

No conforme con estos pronunciamientos la parte demandada interpuso recurso de apelación, atribuyendo a la corte inferior veinticuatro errores que pasamos a discutir.

 El primer error se relaciona con la moción eliminatoria que fué declarada sin lugar en todas sus partes por la corte sentenciadora.

No vamos a discutir detalladamente las alegaciones cuya eliminación se solicita. Ninguna de ellas, a nuestro juicio, perjudica a la parte demandada. Se alega en la demanda que Juan López murió a consecuencias del accidente, siendo soltero, de veinticinco años de edad, sin descendientes legítimos ni naturales y que, habiendo premuerto su madre legítima, "es su único y universal heredero, con derecho a su herencia, su padre legítimo, el aquí demandante Sandalio López." La demandada solicitó la eliminación de las palabras que aparecen entre comillas. Se arguye que ésta es una acción entablada de conformidad con el artículo 61 del Código de Enjuiciamiento Civil, creando un derecho a favor de los herederos o representantes personales del interfecto, cuando éste fuere mayor de edad, y se dice que como en la demanda no hay alegación alguna de que Juan López falleciese *abintestato,* resulta claro que la expresión "es su único y universal heredero" pretende subsanar la alegación de hecho de no haber otorgado testamento.

Las alegaciones de la demanda son claras y precisas. Se afirma que Sandalio López es el único heredero de Juan López, y si éste falleció siendo soltero, cuando ya su madre había muerto, sin dejar descendientes legítimos ni naturales, su único familiar con derecho a heredarle tiene que ser necesariamente el demandante Sandalio López, de setenta y siete años de edad, que es su padre superviviente. Esta corte ha resuelto que es permisible alegar una conclusión de derecho, siempre y cuando surjan de las alegaciones los hechos que

dan lugar a la conclusión legal. *Alfaro* v. *Alonso,* 27 D.P.R. 53; *Martínez* v. *Oppenheimer,* 31 D.P.R. 904.

 Se solicita además la eliminación de todas aquellas alegaciones encaminadas a establecer de antemano que no hubo negligencia contribuyente de parte de Juan López y Angel Cabán Santiago. Aparte de que esta alegación en nada perjudica a la parte demandada, no vemos cómo podemos nosotros evitar que un demandante consigne en su demanda que no contribuyó con su negligencia al accidente. *González* v. *Malgor, Luiña & Co.,* 29 D.P.R. 107, *Rosado* v. *Ponce Ry. Light Co.,* 20 D.P.R. 564, 584; 45 C. J. 1105. Algunos tribunales han llegado al extremo de exigir en estas acciones basadas en negligencia, una alegación estableciendo que el demandante no ha sido culpable de negligencia contribuyente. 45 C. J. 1107. Otros, que constituyen la inmensa mayoría, sostienen que el demandante no está obligado a establecer esta alegación y que incumbe al demandado probar dicha negligencia. 45 C. J. 1105. No se ha sostenido, sin embargo, que el demandante no pueda, si así lo desea, anticipar dicha defensa. Debe desestimarse el error apuntado.

 Los demás particulares de la moción para eliminar se refieren a ciertas alegaciones que a juicio de la demandada resultan meras conclusiones y materia argumentativa. Se solicitó, por ejemplo, la eliminación de las siguientes palabras: "cuidadosamente y con toda precaución", "súbitamente", "haciendo esta operación la empleada de la demandada nerviosamente y súbita e inesperadamente", "a gran velocidad", y "descuidada y negligentemente manejada". Las alegaciones que se ha pretendido eliminar son en realidad inofensivas, y, aunque algunas de ellas constituyan conclusiones y resulten argumentativas, la verdad es que en nada perjudican a la parte demandada y que las demandas presentan con claridad la teoría del caso y los hechos en que descansan los demandantes para sostener las acciones por ellos entabladas.

■■■ El segundo motivo de error se basa en las excepciones previas formuladas contra la demanda, que fueron declaradas sin lugar. En el caso de Sandalio López se alega que la demanda no aduce hechos suficientes para determinar una causa de acción. La demandada, que en su moción eliminatoria solicitó que se eliminasen las palabras "es su único y universal heredero", arguye ahora que el demandante tiene que alegar y probar que era tal heredero, porque la ley que rige en estos casos es el artículo 61 del Código de Enjuiciamiento Civil y no los artículos 1803 y 1804 del Código Civil. Para la demandada, si no estamos equivocados, en una acción de daños y perjuicios, regida por los preceptos citados del Código Civil, no es necesario tramitar previamente y presentar como prueba la declaratoria de herederos; pero sí lo es en el presente caso en que a su juicio se trata de una acción regida por el artículo 61 del Código de Enjuiciamiento Civil.

La distinción que trata de establecer la parte apelante entre las disposiciones de ambos códigos con relación a la evidencia aportada carece de importancia. La acción ejercitada tiene su origen en el artículo 1803 del Código Civil (*Orta v. P. R. Ry. Light & Power Co.*, 36 D.P.R. 743); pero cualesquiera que sean las disposiciones legales que la regulen, la verdad es que el demandante ha demostrado, no solamente que dependía para su subsistencia de su hijo Juan López, sino también que es su único y universal heredero como alega en la demanda. Se ha demostrado además que el demandante Sandalio López, su hija Julia López, y el interfecto, vivían juntos, y que el último, que carecía de bienes, murió sin otorgar testamento. Esta prueba no ha sido rebatida por la parte demandada. El procedimiento *ex parte* de una declaratoria de herederos no hubiera podido tener una fuerza probatoria superior a estos testimonios, producidos en un procedimiento contencioso en que la parte afectada por la prueba puede utilizar el arma de la repregunta y ofrecer

cualquier otra defensa que tenga a bien interponer. En el caso de *Soriano* v. *Rexach,* 23 D.P.R. 573, esta corte ha dicho que las declaraciones de los testigos en el juicio sobre los méritos de la cuestión, tienen más importancia intrínseca y verdadero valor probatorio y hasta constituyen mejor prueba del hecho, que la mera copia certificada de la orden en el procedimiento *ex parte* en que no ha habido intervención de la parte contraria. Este valor probatorio, sin embargo, sólo puede tener alcance y eficacia con relación al demandado en el caso concreto de que se trata.

El precepto de la Ley núm. 9, aprobada por la Legislatura de Puerto Rico en 5 de abril de 1933 (Leyes de 1932–33, pág. 199), disponiendo que ninguna corte de distrito de Puerto Rico admitirá ni dará curso a ninguna petición sobre declaratoria de herederos que no se presente acompañada del certificado del Secretario de la Corte Suprema, en que se haga constar bajo su firma y sello oficial que no aparece de las constancias obrantes en el libro preparado al efecto que la persona designada haya otorgado testamento, no es de aplicación al presente caso, en que no se trata de una declaratoria de herederos. Este requisito es necesario en el procedimiento *ex parte,* donde la parte que interesa la declaratoria de herederos debe producir toda la prueba accesible para demostrar a la corte que no se ha otorgado testamento. Como ya hemos dicho en este caso, las personas que vivían con Juan López, quien carecía de bienes, declararon que éste murió sin otorgar testamento. La parte demandada no presentó evidencia alguna para refutar esta prueba.

Alega el apelante que de la prueba se desprende que Juan López no era soltero. Basa este aserto en una manifestación del testigo Angel Cabán Santiago, quien declaró que el referido Juan López se dirigía a Aguadilla para ver a su señora. De aquí deduce la demandada que el interfecto era casado. La prueba demuestra claramente que Juan López no contrajo matrimonio. Tanto el demandante como los testigos Julia

López y Angel Durán manifiestan que era soltero. El demandante manifestó que había una mujercita a quien su hijo visitaba de vez en cuando. A esta mujercita se refirió probablemente Angel Cabán Santiago cuando dijo que Juan López se dirigía a Aguadilla para ver a su señora. La demandada no presentó prueba alguna para contradecir la evidencia del demandante sobre el estado de soltería de su hijo Juan López.

▉▉ En el caso de Angel Cabán Santiago alega la apelante que la corte cometió error al declarar sin lugar la excepción previa de indebida acumulación de acciones. El demandante reclama una suma de dinero en concepto de indemnización por los daños relacionados con las lesiones recibidas y solicita también una indemnización por las pérdidas sufridas con motivo de los deterioros y daños ocasionados al *truck* de su propiedad. Éstas son las dos acciones que a juicio de la demandada han sido indebidamente acumuladas. Se arguye que la Corte de Distrito de Aguadilla erró al resolver que la ley aplicable en este caso era la núm. 4, de marzo 30, 1933 (Leyes de 1932–1933, pág. 187), que empezó a regir en junio 28, 1933, en virtud de la cual la causa de acción de daños a la persona y a la propiedad procedentes del mismo acto torticero pueden ser acumuladas en la misma demanda, sin que sea necesario exponerlas separadamente.

La demandada apelante parte de la base de que los daños ocasionados al demandante y al camión de su propiedad en un mismo accidente constituyen dos causas de acción distintas que no pueden acumularse bajo el artículo 104 del Código de Enjuiciamiento Civil antes de ser enmendado. No estamos seguros de que ésta sea la mejor doctrina. Las decisiones están en conflicto sobre este particular. Hay algunas que sostienen que los daños causados a un individuo y a su propiedad, derivados de un mismo acto torticero, constituyen una sola causa de acción. *King* v. *Chicago M. & St. P. Ry. Co.*, 80 Minn. 83, 82 N. W. 1113. Y hay otras que sostienen lo contrario. *Lamb* v. *Harbaugh*, 105 Cal. 680, 39 P. 56.

Pero aunque se trate de distintas causas de acción y aunque las mismas no puedan acumularse bajo la ley en vigor antes de aprobarse la enmienda, entendemos que la corte inferior no ha cometido el error que se le atribuye, por las razones que pasamos a exponer.

La excepción previa fué radicada en 19 de junio de 1933 y declarada sin lugar en 12 de julio del mismo año. La excepción fué resuelta con posterioridad a la vigencia de la Ley núm. 4, aprobada en 1933. Se alega que esta ley no tiene efecto retroactivo. La apelante admite que es verdad que las leyes procesales por regla general tienen efecto retroactivo, pero sostiene que cuando una de las partes ha adquirido un derecho bajo el sistema procesal anterior, no puede quitársele este derecho dándole fuerza retroactiva a la nueva ley. Es ésta una cuestión resuelta ya por este tribunal. En el caso de *Ojeda* v. *Gavilán,* 46 D.P.R. 399, el demandado compareció ante una corte de distrito solicitando el levantamiento de un embargo decretado a solicitud del demandante, y posteriormente presentó una moción pidiendo el traslado del pleito a otra corte de distrito. De acuerdo con el artículo 77 del Código de Enjuiciamiento Civil, vigente cuando se presentó la solicitud de embargo, el demandado, en virtud de la misma, quedó sometido a la jurisdicción de la corte donde se inició el pleito. Posteriormente el referido artículo fué enmendado en el sentido de impedir que esta comparecencia surtiese el efecto de una sumisión. Esta corte resolvió que la enmienda, por tratarse de una regla de procedimiento, tenía aplicación inmediata, y retroactiva, y revocó la decisión de la corte inferior, expresándose en los siguientes términos:

"La enmienda estaba vigente al resolverse la moción de traslado. No lo estaba es cierto al solicitarse el levantamiento del embargo, pero ello no importa por tratarse de una regla de procedimiento de aplicación inmediata, de acuerdo con la doctrina establecida en los casos de Iglesia Católica Apostólica Romana en Puerto Rico v. El Pueblo, 7 D.P.R. 358; Cintrón et al., v. Banco Territorial y Agrícola, 15 D.P.R. 507; Brenes v. A. Hartman & Co., 17 D.P.R. 598; y Arbona Hermanos v. H. C. Christianson, 26 D.P.R. 284."

De acuerdo con el criterio de esta corte, no adquirió el demandante en el caso citado un derecho a ventilar el pleito en la corte de distrito donde se radicó la demanda por el hecho de que el demandado hubiese solicitado el levantamiento de un embargo cuando esta solicitud equivalía a una sumisión a la jurisdicción de la corte. La enmienda surtió efecto retroactivo y el demandado pudo obtener el traslado al amparo de la misma.

En el caso de *Howard* v. *Fall River Iron Works Co.*, 203 Mass. 273, 89 N. E. 615, los hechos alegados son muy parecidos a los que concurren en el presente caso. La Corte Suprema de Massachusetts se expresó así:

"Pero el demandado alega que la demandante no pudo reclamar basada en su causa de acción bajo el derecho común; que ella no tenía derecho a acumular una acción bajo el derecho común por sufrimientos físicos con una acción bajo el estatuto por muerte de su causante. Ésta era la situación antes de haberse aprobado el estatuto de 1906, pág. 345, cap. 370. Brennan v. Standard Oil Co., 187 Mass. 376, 73 N. E. 472. El accidente ocurrió en febrero 16, 1906. Esta demanda fué promovida en abril 7 y el causante de la demandante murió en abril 19 del mismo año, antes de que el estatuto anteriormente referido entrase en vigor. Alega el demandado que este estatuto no debe tener carácter retroactivo y que la regla establecida en el caso de Brennan, supra, es la que debe aplicarse. Pero éste es un estatuto procesal y nosotros hemos decidido hasta aquí que se aplica tanto a las acciones pendientes al tiempo de su aprobación como a las acciones promovidas antes de que entrase en vigor. Bartley v. Boston & Northern St. Ry., 198 Mass. 163, 168, 83 N. E. 1093, y casos citados. El estatuto se refiere simplemente a la forma de procedimientos mediante los cuales los derechos existentes deben hacerse efectivos. De acuerdo con principios familiares debe aplicarse también a causas de acción que se habían originado cuando el estatuto fué aprobado."

El error apuntado debe ser desestimado.

■ Los errores tercero, cuarto, quinto y sexto, que pasamos a discutir conjuntamente, dicen así:

"*Tercero:* La Corte de Distrito de Aguadilla cometió manifiesto error al sostener que la apelante había establecido y operaba en la

fecha del accidente una bandera (*flagman*) para avisar al público la aproximación de sus máquinas y trenes al cruce del accidente.

"*Cuarto:* La Corte de Distrito de Aguadilla erró al sostener que era la costumbre de la demandada manipular banderas de señales para anunciar el peligro de la aproximación de sus máquinas y trenes al cruce del accidente.

"*Quinto:* La Corte de Distrito de Aguadilla erró al sostener que era la costumbre de la empleada a cargo de las barreras estacionarse junto a los cruces y banderas de señales.

"*Sexto:* La Corte de Distrito de Aguadilla cometió manifiesto error al dictar sentencia en este caso por el fundamento de no haberse puesto la bandera que anunciaba la proximidad del tren."

La parte apelante extracta de la opinión de la corte inferior, para comentarlas y rebatirlas, aquellas conclusiones relacionadas con la bandera de señales. Nosotros vamos a permitirnos transcribir a continuación en toda su integridad el párrafo en que el tribunal sentenciador establece ésta y otras conclusiones de hecho que sirvieron de base a su fallo:

"La corte, conforme a la evidencia aportada por ambas partes considera probados los siguientes hechos esenciales: Que el día 24 de octubre de 1932, como a las 2:45 de la tarde más o menos, Juan López, causante del demandante, venía en un *truck* Ford C P 233, propiedad de Ángel Cabán Santiago y manejado por el *chauffeur* Arturo Vega en dirección de Isabela hacia Aguadilla, estando dicho *truck* cargado con veinticuatro sacos de arroz, y que al aproximarse a un paso a nivel que está en la carretera núm. 2, trayecto entre Aguadilla e Isabela, kilómetro 140, hectómetro 5, un tren de pasajeros de la demandada American Railroad Company chocó con el *truck* de referencia, ocasionando la muerte del indicado Juan López; que en el paso a nivel de referencia la compañía demandada tenía establecido en la fecha del accidente y operaba un sistema de cruces o barreras (guardabarreras), y una bandera (*flagman*) para avisar al público la aproximación de sus máquinas y trenes, habiendo sido siempre la costumbre allí de cerrar el paso a nivel bajando las barreras y manipulando la bandera de señales para anunciar el peligro, cosa que se hacía momentos antes de llegar los trenes y máquinas de la demandada a dicho paso a nivel, siendo también la costumbre de la empleada a cargo de las barreras y bandera establecerse junto a los cruces y bandera de señales, y que los trenes antes de llegar a dicho paso a nivel tocaban su pito y campana para anun-

ciar su proximidad; que al bajar el *truck* en que viajaba el causante del demandante, el *chauffeur* detuvo el *truck* y casi lo paró al acercarse al cruce y trató de cerciorarse si venía o no algún tren, no habiendo visto ni oído tren alguno, ni señal de su proximidad, por no haberse tocado pito o señal alguna de alarma, y no habiéndose tampoco puesto la bandera que anunciaba la proximidad del tren, ni bajado las barreras por la encargada de las mismas; que el *truck* continuó su marcha, bajando la cuesta y fué a cruzar las vías del ferrocarril y en ese mismo momento la encargada de las barreras súbitamente trató de poner, y puso algunas de dichas cruces o barreras, cuando ya el *truck* no podía materialmente detenerse (aunque no colocó la bandera de señales), yendo las cruces a chocar sobre el *truck* en que viajaba el causante del demandante, y simultáneamente apareció un tren de pasajeros en dirección hacia San Juan, viniendo dicho tren a chocar con el *truck* de referencia, ocasionando como se ha dicho antes, la muerte del expresado Juan López; que el *truck* era guiado cuidadosa y diligentemente, y que la causa única del accidente de referencia fué la culpa, descuido y negligencia de los empleados de la demandada que allí y entonces actuaban como tales empleados, siendo la muerte de dicho Juan López el resultado próximo y único de dicho choque.''

Las conclusiones de la corte sobre la bandera de señales no constituyen la base de la sentencia apelada. El tribunal *a quo* descansa en varios fundamentos que bastan para sostener su fallo descartando la cuestión relacionada con la bandera. Sostiene la parte apelante que las manifestaciones del tribunal sentenciador sobre la costumbre de manipular la bandera no están sostenidas ni por el más remoto indicio de prueba. Vamos a transcribir la evidencia que a nuestro juicio indujo a la corte inferior a establecer sus conclusiones. El testigo de la demandada Adolfo Hernández declaró que sintió a Andrea González cuando gritaba: ''Pare, pare''; que entonces se paró a ver lo que era y que tenía una bandera colorada en la mano y con esa bandera le decía eso al *truck*. Andrea González, la guardabarreras de la compañía declara que cuando divisó al *truck* vió que no hacía precaución de parada ninguna y le hizo señas con un banderín; que tales señales se las hacía desde las mismas maniguetas;

que ese banderín era de un color rojo y uno verde; que el *truck* venía corriendo ni muy ligero ni muy poco a poco; que ella le hacía señales con un banderín y además de eso le gritaba con la boca y le decía: "Pare, pare, que lo coge el tren"; que el *truck* venía caminando moderadamente; que ella había visto otros automóviles caminando ligero, pero ése, refiriéndose al *truck* del accidente, no era de los que venían corriendo muy ligero, ése venía moderadamente; que fué entonces cuando ella estaba abajo haciendo señales con una bandera roja en la mano; que le hacía señales con el banderín; que empezó a hacerle señas al *truck* porque vió que no hacía la precaución de parar; que hace señas cuando tiene necesidad; que cuando ve que se van a parar no tiene por qué gritarle ni hacerle señas. El testigo de la demandada Eduardo Ramos manifestó que sintió unos gritos y miró para la carretera y vió a la guardabarreras con un banderín que lo meneaba para todos lados y decía: "Pare, pare", y entonces sintió el choque y fué para el sitio.

No diremos que la corte inferior apreció con riguroso acierto el testimonio de los testigos de la demandada con respecto a la bandera y a las señales, pero sí creemos que no estuvo huérfana de prueba al establecer sus conclusiones. Como ya dijimos antes, la corte inferior descansa en otros fundamentos que bastan para sostener su fallo.

El apelante alega que no existe ley alguna en Puerto Rico exigiendo el uso de bandera de señales en los cruces de los ferrocarriles con caminos públicos, y que la Ley núm. 70 de 1917 ((II) pág. 433), que determina los deberes y derechos de los ferrocarriles en estos cruces, nada dice sobre este particular. Es verdad que la ley referida no exige la precaución apuntada; pero no nos atreveríamos nosotros a decir de una manera categórica que en todos los casos y bajo todas las circunstancias está la compañía relevada de adoptar la referida precaución. Todo depende del carácter del cruce y de la costumbre establecida por la compañía ferroviaria. El cruce puede ser de tal naturaleza que requiera la presencia

allí de una persona encargada de anunciar la proximidad del tren por medio de bandera de señales. El establecimiento de barreras en un cruce exige necesariamente la presencia de una persona que se encargue de manipular esas barreras para impedir el paso cuando se aproxima el tren. También cuando la compañía ha establecido la costumbre de mantener en el cruce una persona encargada de tales avisos, la omisión de observar esta costumbre puede constituir un acto de negligencia en determinadas circunstancias. 52 C. J. 418; *Casey v. N. Y. Central & Hudson River Railroad Co.*, 78 N. Y. 518, 16 N. Y. Court of Appeals Rep. 541; *St. Louis S. W. Ry. Co. of Texas v. Boyd*, 56 Tex. Civ. Ap. 282, 119 S. W. 1154.

El séptimo error se basa en haber sostenido la corte inferior que el tren no tocó pito ni campana y que no dió señal alguna de alarma al aproximarse al cruce donde ocurrió el accidente. Sobre este particular hubo conflicto de prueba. El demandante ofreció la suya para demostrar que no se tocó pito o campana o se dió señal alguna; la demandada también produjo prueba para demostrar que hubo toque de pito o campana. Arturo Vega, conductor del *truck*, y Angel Cabán Santiago, declararon que no oyeron pito o campana o señal alguna por parte del tren. La demandada arguye que estos testigos tienen interés en el asunto y que no estaban en condiciones de poder oír pito o campana debido a que se encontraban encerrados en el gabinete del *truck* y que además este vehículo venía bajando en segunda, haciendo el ruido consiguiente con su motor. El testigo Arturo Vega declaró que los cristales del carro estaban bajados y el *windshield* levantado cuando ocurrió el accidente. En cuanto al interés que hayan podido tener estos testigos y otros de la demandada en el resultado del pleito es cuestión que incumbe resolver al tribunal inferior. No fueron éstos, sin embargo, los únicos testigos del demandante que declararon sobre este particular. El testigo Mamerto Molinary dice que no oyó pito ni campana, que el tren no tocó pito ni campana el día del accidente. En el mismo sentido declaró Angel

Durán, quien venía en la parte de atrás del *truck*. Cuando se preguntó a este testigo si el tren tocó pito o campana, respondió: "No, señor, nada"; añadiendo que no sintió ningún otro signo de alarma.

Apunta la apelante que el testimonio de haber oído tiene más valor probatorio que la declaración de no haberse oído. El principio parece aceptable, en igualdad de condiciones, pero, aparte de que hubo testigo que declaró afirmativamente que no se tocó pito ni campana, ésta es una cuestión a decidir por la corte inferior al apreciar la prueba. En el presente caso el tribunal juzgador dió mayor crédito a la prueba del demandante que a la que produjo la demandada sobre este particular. Hemos estudiado detenidamente la evidencia aportada y toda vez que el conflicto que surge de la misma fué resuelto a favor de los demandantes, sin que se advierta que el tribunal *a quo* haya incurrido en manifiesto error, no nos sentimos inclinados a alterar sus conclusiones.

El octavo motivo de error se basa en haber sostenido el tribunal inferior que la declaración del testigo de la demandada Pedro Arroyo confirma el hecho de que el tren no dió aviso ni señal de alarma al aproximarse al cruce. Este testigo se expresó así: "Pues yo iba en el último coche y no me dí cuenta de si el tren tocó pito o campana." La declaración de este testigo no fué la única que se produjo sobre la omisión atribuída a la demandada en relación con el toque de alarma. Como ya hemos dicho, algunos testigos declararon que no oyeron y otros que no se tocó pito o campana. La corte inferior llama la atención al testimonio de Pedro Arroyo, por tratarse de un testigo de la parte demandada. Debe desestimarse el error apuntado.

En los errores noveno y décimo se alega que la corte inferior cometió error al sostener que las barreras fueron bajadas súbitamente cuando ya el *truck* no podía materialmente detenerse y al dictar sentencia por el fundamento de que las barreras no fueron bajadas por la encargada de las

mismas. Sostiene el apelante que de la declaración del testigo del demandante Arturo Vega, el *chauffeur* que guiaba el *truck*, se desprende que las barreras fueron bajadas antes de que el *truck* llegara a las más próximas. Este testigo dice que la guardabarreras "le tiró las barreras un poco antes de llegar a la vía, como dos o tres metros antes de llegar a la vía." Arguye la demandada que las barreras, una vez bajadas, distan aproximadamente tres metros del eje de la vía y dos metros y medio del rail, y que según el *chauffeur* Arturo Vega, el gabinete del *truck* distaba como un metro o metro y medio del frente de dicho *truck*. Luego de establecer estas premisas se formula la siguiente pregunta: Si las barreras distan dos metros y medio de la vía, y el *truck*, según el *chauffeur* Arturo Vega, estaba a tres o cuatro metros de la vía cuando las barreras fueron bajadas, ¿cómo es posible que las mismas cayeran sobre el gabinete que está situado después del bonete del *truck?* El testigo dijo en una ocasión que como a tres o cuatro metros antes de llegar a la vía la mujer bajaba las barreras ligero y nerviosa, y en otra manifestó que la guardabarreras le tiró las barreras un poco antes de llegar a la vía, como dos o tres metros antes de llegar a la vía, y a esta distancia "le tiró las agujas esa mujer." La guardabarreras pudo maniobrar para bajar las barreras cuando el *truck* se encontraba a tres o cuatro metros o a dos o tres metros antes de llegar a la vía, ya en la zona comprendida entre la vía y las barreras, y como el *chauffeur* pudo haber avanzado y la prueba demuestra que aceleró la marcha para defenderse, no es extraño que las barreras pudiesen haber caído sobre el gabinete del *truck*. Hay que tener en cuenta que un accidente de esta naturaleza se desarrolla con inusitada rapidez, provocando la consiguiente excitación, y que no es de esperarse, ni debe exigirse, de un testigo en estas condiciones que fije con exactitud matemática hechos y detalles que fueron objeto de una festinada observación. Cuando estos hechos, así relatados, han podido

ocurrir y desarrollarse en la forma expuesta por el testigo, su grado de veracidad no debe depender de una falta de precisión al fijar la distancia, o de una ligera variación en la apreciación de la misma. Y en este caso es muy posible que los hechos ocurrieran en la forma relatada y que cuando se comenzaron a bajar las barreras, el *chauffeur* del *truck,* que se encontraba ya muy cerca, casi o dentro de la zona comprendida entre las barreras y la vía, no creyendo que tuviese tiempo para detenerse, acelerara la marcha, como surge de su declaración, y que las barreras cayeran sobre el gabinete del *truck.*

El *chauffeur* referido declaró en síntesis lo siguiente: Que el día 24 de octubre de 1932 venía de Camuy para Aguadilla y como a las dos y cuarenta y cinco minutos se aproximaba al paso a nivel de Aguadilla, el que queda en la cuesta de Aguadilla, a la subida para los pueblos de Isabela y Camuy, o sea la carretera núm. 2; que como a cincuenta metros antes de llegar al paso a nivel se fijó que las cruces estaban paradas y siguió bajando en segunda; que venía de Isabela para Aguadilla y que como quince metros antes de llegar más o menos al paso a nivel redujo la velocidad, miró y oyó, y no vió nada que le interrumpiera el paso y siguió; y un poco antes de llegar a la vía, como dos o tres metros antes de llegar a la vía le tiró las agujas esa mujer; explica que llama agujas a las cruces que ponen en los pasos a nivel; que al ver las agujas se impresionó y en seguida vió la trompa del tren que estaba ya pegado al lado suyo; que al hablar de la trompa del tren se refiere a la parte delantera de la máquina; que el tren iba a cruzar el paso a nivel, caminando de Aguadilla para Isabela; que el tren salió de la izquierda del declarante; que cuando vió el tren tan pegado y las crucetas encima aceleró la máquina para defenderse porque ya estaba encima de él; pero siempre lo cogió por la parte de las ruedas traseras, cargándolo sobre el lado derecho donde está el poste de las crucetas; que el

tren botó el *truck* sobre el lado derecho para el sitio donde está la manivela que tienen para poner las crucetas; y que de allí salieron heridos Angel Cabán Santiago, Juan López, y Arturo Vega; que las cruces las manipuló una señora; que antes de ocurrir el accidente él no la había visto a ella; que se dió cuenta de que la señora manipulaba las agujas, por primera vez, cuando estaba ya casi en la vía; que la señora las tiró ligero, de manera que dos cayeron sobre el gabinete del *truck*, y dos quedaron paradas; que cayeron la izquierda y la derecha sobre el gabinete y que de las dos de allá rompió una cuando el tren arrolló el *truck* sobre el lado derecho; que el testigo apresuró la marcha del *truck* para salir del sitio porque el tren estaba pegado ya y para que no le pasara por encima del gabinete; que sólo dos barreras resultaron rotas, la de la parte izquierda entrando, y de las otras dos la del lado derecho, o sea donde el tren botó al *truck;* que cuando la señora tiró las dos primeras barreras, las otras dos no estaban puestas todavía; que bajando de Isabela para Aguadilla podía ver el paso a nivel a cincuenta metros más o menos, porque las flechas, o sea las barreras, estaban paradas para arriba; que pudo verlas porque esa parte queda más alta y el paso a nivel queda más abajo; y que a cincuenta metros más o menos el paso a nivel se ve perfectamente bien; que al decir que redujo la velocidad, oyó y miró, quiere decir que casi paró el carro para ver si había algún peligro y como no vió ninguno, siguió bajando; que como a tres o cuatro metros antes de llegar a la vía la mujer bajaba las barreras ligero y nerviosa, y que entonces vió que las flechas le cayeron encima y vió la trompa del tren casi pegada del *truck,* por lo que aceleró la máquina para defenderse; que antes de ese momento no se había dado cuenta de la llegada del tren, ni sintió pito, campana ni ningún otro ruido o signo de alarma; que el tren iba subiendo ligero; que el tren iba tan ligero que al arrollarlos pasó todo el paso a nivel; que el tren era de pasajeros, máquina núm. 64, y que actuaba como

maquinista ese día José Gallardo; que ese día viajaban con él Angel Cabán Santiago, dueño del *truck*, Angel Durán, peón del *truck*, y Juan López, que fué el que murió como consecuencia de los golpes que recibió en el choque; que por el paso a nivel donde ocurrió el accidente ha pasado en otras ocasiones en que han tenido que pasar por allí otros trenes; que la costumbre de los empleados de la compañía era bajar las flechas antes de llegar el tren; que el día 24 de octubre se bajaron las barreras cuando el *truck* estaba a tres o cuatro metros de la vía y el tren estaba ya frente a frente; que la trompa del tren estaba casi pegada del *truck*, cuando entraron las primeras ruedas en el paso a nivel.

Arguye la apelante que Arturo Vega debió haber visto la guardabarreras antes de cruzar el paso a nivel, ya que éste era visible desde una distancia de cincuenta metros antes de llegar al cruce. Añade que la circunstancia de que Arturo Vega no viera la guardabarreras hasta después del accidente demuestra que no es cierto que observara, viera o mirara, ya que de haber visto y mirado, debió haber visto a la guardabarreras. El testigo declara que antes de ocurrir el accidente no vió a la guardabarreras y que se dió cuenta de que manipulaba las agujas cuando estaba ya casi en la vía. Así pudo ocurrir, si se tiene en cuenta que de acuerdo con la prueba de los demandantes las barreras fueron bajadas súbitamente, cuando el tren estaba ya encima, deduciéndose de esta prueba que la guardabarreras llegó en aquellos momentos al paso a nivel.

A juicio de la demandada el hecho de que las barreras fueran bajadas demuestra que el tren tocó pito o dió algún aviso. No necesariamente. Si las barreras fueron bajadas súbitamente, en los momentos de aproximarse el tren, cuando no había tiempo para impedir el accidente, como se ha demostrado por la prueba del demandante, creída por la corte inferior, no puede decirse que el hecho de haberse bajado las barreras constituya evidencia de que el tren avisara opor-

tunamente, por medio de pito o campana o de cualquier otra
señal, su aproximación al cruce.

La demandada discute detalladamente la prueba
aportada en un alegato que contiene 206 páginas. No pode-
mos nosotros detenernos a señalar minuciosamente todos los
detalles diseminados en la prueba, porque lo consideramos
innecesario y porque tendríamos que extendernos considera-
blemente en esta opinión que ya resulta bastante voluminosa.
Nos limitaremos a decir que la declaración del *chauffeur*
Arturo Vega está corroborada por la de varios testigos pre-
senciales ofrecidos por el demandante.

De parte de la demandada declararon varios testigos que
las barreras fueron bajadas antes de llegar el *truck* al cruce.
La corte inferior resolvió el conflicto de la prueba en favor
de los demandantes, y, no habiéndose demostrado que haya
incurrido en manifiesto error o actuado movida por pasión,
prejuicio o parcialidad, nosotros debemos respetar el criterio
del tribunal sentenciador.

La apelante arguye que el hecho de que el radiador del
*truck* y la varilla del guía aparecieran averiados demuestra
que hubo algún choque con la parte delantera del *truck*.
Sobre este extremo declaró el testigo Pedro González, de
la demandada, quien reparó el *truck*. Luego declaró Felipe
R. Cuevas, perito mecánico y testigo de la demandada, quien
dijo que según su experiencia para que el radiador de un
carro y la varilla del guía sufran averías es forzoso llegar
a la conclusión de que hubo un impacto de frente. La de-
mandada apelante deduce que estas averías las sufrió el
*truck* al romper las barreras, que habían sido bajadas, ya
que de ninguna otra manera podían haber ocurrido dichas
averías, partiendo de la base de la propia descripción del
accidente hecha por los testigos del demandante. Esta evi-
dencia, de carácter circunstancial, no destruye la prueba di-
recta que sobre el particular ofreciera la parte demandante,
ni constituye base suficiente para que nosotros podamos afir-
mar, en pugna con la prueba creída y con las conclusiones

establecidas por el tribunal juzgador, que el *truck* rompió las barreras con el frente del carro. La prueba demuestra que dicho *truck* fué arrastrado por la máquina y tirado sobre la barrera derecha más lejana. Es posible que al ocurrir la colisión y ser arrastrado el *truck,* el radiador chocara con algún objeto. El movimiento de un *truck,* al recibir el impacto de una locomotora, en las condiciones en que ocurrió este accidente, no es fácil de precisar con exactitud. El estado de las cosas antes del choque quedó demostrado, según se deduce del fallo de la corte inferior, por el testimonio de testigos oculares. El tribunal *a quo* dió crédito a la prueba del demandante y no sería razonable que nosotros, basados en inferencias surgidas del estado del *truck* después del accidente, pusiéramos en tela de juicio y descartásemos el testimonio de testigos, creídos por el juzgador, que narran los hechos en una forma en que muy bien pudieron ocurrir.

El undécimo error se basa en que la corte dictó sentencia a favor de los demandantes, a pesar de que según el peso y la preponderancia de la prueba, la demandada no fué culpable de negligencia alguna. Hemos examinado detenidamente la prueba practicada y creemos que no estamos en condiciones de decir que la corte inferior cometió el error que se le atribuye.

El duodécimo error consiste en no haberse admitido como evidencia el informe rendido por la apelante dentro de los tres días del accidente a la Comisión de Servicio Público. La apelante, en el acto del juicio, trató de presentar como evidencia una copia carbón de un informe rendido a la Comisión de Servicio Público por dicha apelante y habiéndose opuesto los apelados y discutido el caso, la corte negó la admisión del expresado documento. Este informe se rinde de acuerdo con el apartado *w* de la Ley núm. 70 de 1917 ((II) pág. 433, art. 3), según el cual toda compañía de servicio público tiene el deber de dar un aviso inmediato a la Comisión de Servicio Público en caso de cualquier accidente relacionado o en conexión con la explotación de su propiedad, etc., en

el tiempo y forma que la comisión, en virtud de una regla general u orden especial o de otro modo, requiriera. Este informe, por disposición expresa de la ley, no quedará abierto a la inspección pública excepto por orden de la comisión, y no será admitido en prueba para ningún fin en ningún pleito o acción por daños y perjuicios que naciera de cualquier asunto o cosa que en dicho informe se mencione.

Este precepto basta para declarar inadmisible la prueba. Es además una regla firmemente establecida que la manifestación de una parte, verbalmente o por escrito, en su propio beneficio (*self-serving*) no es admisible como evidencia en su favor. Tales manifestaciones se hacen usualmente en casos en que el declarante tiene algún interés en presentar los hechos en la forma relatada por él. El elemento del interés al tiempo de hacer la manifestación no es esencial. Se ha considerado que la regla se aplica con toda su fuerza a pesar del hecho de que la declaración no envolvía interés alguno en el momento en que fué hecha. 22 C.J. 220–225. Debe desestimarse el error apuntado.

Los errores décimotercero y décimocuarto se basan en que la sentencia dictada es contraria a los hechos y al derecho y en que la corte inferior, en la conducción de la vista, en su apreciación de la evidencia, y al pronunciar su fallo, obró con pasión, parcialidad y prejuicio manifiestos. La demandada dedica cincuenta páginas de su alegato a la discusión de estos supuestos errores. Hemos examinado detenidamente la prueba, hemos leído con la atención que merece el alegato del distinguido abogado de la parte demandada, y no encontramos que la corte inferior haya incurrido en los errores que se le atribuyen. No actuó ciertamente con pasión, parcialidad y prejuicio. Su conducta durante la vista del juicio no demuestra que así actuara y sus conclusiones al pronunciar su fallo no pueden interpretarse en el sentido que pretende la parte demandada. Deben desestimarse los errores apuntados.

Los errores décimoquinto y décimosexto dicen así:

"*Décimoquinto:* La Corte de Distrito de Aguadilla cometió manifiesto error al dictar sentencia en contra de la demandada apelante al sostener que aún en el caso de que hubiera habido negligencia contribuyente por parte del *chauffeur* del *truck* donde viajaba el causante del demandante Sandalio López, esta negligencia no podría imputarse a dicho causante.

"*Décimosexto:* La Corte de Distrito de Aguadilla cometió manifiesto error al dictar sentencia en contra de la demandada apelante, porque según el peso y la preponderancia de la prueba, los demandantes fueron culpables de negligencia contributoria, siendo ésta la causa próxima e inmediata del accidente."

Juan López, causante de Sandalio López, viajaba en la parte de atrás del *truck*. Es regla general, reconocida por esta corte, que la negligencia de un conductor de un vehículo no puede ser imputada a un pasajero de dicho vehículo. Así lo resolvimos en *Domínguez* v. *P. R. Ry. Light & Power Co.*, 19 D.P.R. 1090, 1097, y *García* v. *American R.R. Co. of P. R.*, 45 D.P.R. 762, 773. Consideramos innecesario repetir lo que ya dijimos en las opiniones emitidas en los casos citados. No podemos tampoco partir de la base de que el *chauffeur* fuese negligente. La corte inferior, basándose en la prueba practicada, declara que dicho *chauffeur* detuvo el *truck* y casi lo paró al acercarse al cruce. No dice la corte que se hubiese detenido completamente antes de acercarse al paso a nivel ni creemos que fuera necesario, dadas las circunstancias que concurren en este caso. En *García* v. *Am. R.R. Co. of P. R.*, supra, este tribunal se expresó así:

"A nuestro juicio el caso de Goodman no debe interpretarse en el sentido de imponer al conductor de un vehículo de motor el deber de detenerse siempre al acercarse a una vía ferroviaria. No parece razonable exigir invariablemente, en todos los casos, de un conductor, que se detenga por completo antes de llegar a la vía de un tren. La jurisprudencia general no sostiene tal criterio. Háse dicho por un número de tribunales que una persona que se dispone a cruzar la vía de un ferrocarril, manejando un vehículo de motor, debe detenerse, mirar y tratar de escuchar, en un sitio desde donde pueda

tender la vista a través de la vía, para ver si se aproxima algún tren. Prevalece, sin embargo, la regla de que, como cuestión de derecho, no es éste un deber que se impone invariablemente al viajero. Las cuestiones en controversia no son siempre las mismas, los hechos varían, y, para juzgar la conducta de un viajero que no haya detenido su vehículo, hay que tener en cuenta las circunstancias que mediaron al acercarse al cruce, su ignorancia o conocimiento de la situación de la vía y la confianza que haya podido tener en sus oportunidades para ver y oír, a un lado y otro de esa vía. Ya hemos dicho que cada caso tiene sus peculiaridades, sus rasgos característicos, su sello especial, su fisonomía propia, y que no sería empresa fácil impartir justicia si para apreciar qué hechos constituyen cuidado ordinario o negligencia tuviésemos que ajustarnos a reglas fijas e invariables. Rivera v. Central Pasto Viejo, 44 D.P.R. 266 y 267. Para determinar si ha habido o no negligencia en un caso determinado debemos preguntarnos qué hubiera hecho una persona de razonable prudencia en igualdad de circunstancias. No debemos esperar de la naturaleza humana más de lo que humanamente puede dar y no parece razonable exigir precauciones que no se adoptan en el curso ordinario de las actividades humanas, por más que estén justificadas cuando existe alguna razón especial que nos aconseje desplegarlas, velando por la seguridad ajena y por nuestra propia seguridad.''

Así dijimos en opinión que emitiéramos en 28 de noviembre de 1933. La Corte Suprema de los Estados Unidos, en una opinión emitida con posterioridad, en 2 de abril de 1934, refiriéndose también al caso de Goodman, dijo, entre otras cosas, lo siguiente:

''Se hace necesario aclarar en estos momentos las sombras que puedan oscurecer el punto en controversia. No es nuestro ánimo investigar en estos momentos la existencia de un deber de parar independientemente de un deber de bajarse del vehículo y practicar un reconocimiento. Esta investigación, si la hiciéramos, nos haría penetrar en un espeso campo de decisiones que están en conflicto. Algunas cortes aplican la llamada regla de Pennsylvania e imponen un deber invariable de parar, como también de mirar y escuchar, sin parar mientes en que el cruce esté despejado o las vías a cada lado. (Citas.) Otras cortes, la mayoría, adoptan la regla de que el viajero debe mirar y escuchar, pero que la existencia del deber de parar depende de las circunstancias y por lo tanto general, si no invariablemente, de la opinión del jurado. (Citas.) El asunto ha

tenido menos consideración en esta corte, pero en ninguna de sus opiniones aparece la indicación de que en todo cruce el deber de parar sea absoluto, independientemente del peligro. Ni aun en el caso de B. & O. R. Co. v. Goodman, supra, que va más lejos que los primeros casos, puede encontrarse apoyo para dicha regla. Por el contrario la opinión establece de un modo claro que el deber está condicionado por la presencia de impedimentos que hagan que la vista y el oído resulten inadecuados para la protección del viajero." Pokora v. Wabash Ry. Co., 292 U. S. 98, 102.

La Corte Suprema se extiende en otras consideraciones y dice que la opinión en el caso de Goodman ha dado origen a confusiones en las cortes federales, habiendo recibido solamente un apoyo vacilante en las cortes estaduales, y termina con estas palabras: *"We limit it accordingly."*

En el presente caso, en que según la prueba existen barreras en el paso a nivel que utiliza la compañía ferroviaria cuando uno de sus trenes se aproxima al cruce, creemos que el *chauffeur* ejerció un cuidado razonable al reducir su velocidad y casi parar, escuchar y mirar antes de cruzar la vía, según declara en sus conclusiones de hecho el tribunal inferior. Deben desestimarse estos errores.

El error décimoséptimo se basa en que la Corte de Distrito de Aguadilla tomó en consideración, en el caso de Sandalio López, como elementos de daño, las angustias morales y mentales del demandante. El apelante admite que en el caso de *Orta v. P. R. Ry. Light & Power Co.,* supra, se resolvió que éste es un elemento que puede considerarse al fijarse la indemnización de daños y perjuicios, pero sostiene que en ese caso el hijo muerto era un menor de edad y que tratándose en este caso de un hijo que había llegado a la mayoridad no es aplicable lo resuelto por este tribunal. No vemos razón alguna que pueda servir de base para distinguir entre la pérdida de un hijo menor y un hijo mayor de edad, cuando se trata de apreciar las angustias mentales. No podemos admitir que el sufrimiento de un padre a la muerte de su hijo quede afectado por el hecho de que tenga menos de veintiún años de edad. Tampoco puede sostenerse como

una regla invariable que cuando el hijo es mayor de edad el padre ya no necesita de él. De acuerdo con nuestro Código Civil los ascendientes y descendientes legítimos están obligados recíprocamente a darse alimentos, siendo esta obligación exigible desde que los necesitare para subsistir la persona que tuviese derecho a percibirlos. Artículos 142, 143 y 147 Código Civil, ed. 1930.

En este caso se ha demostrado que el demandante dependía de su hijo Juan López. Declara el primero que cuando su hijo murió carecía de sueldo o bienes; que antes sí tuvo, pero que después se enfermó de la vista; que hace siete años que está ciego, y todo se le ha concluído; que cuando murió su hijo vivía de lo que el hijo le daba; que semanalmente le facilitaba el hijo dos o tres pesos para su sostenimiento y el de la hija del declarante; que también le facilitaba zapatos, ropa y medicinas; que fuera de su hijo no tenía ninguna otra persona que le diera para su subsistencia; fuera de él, la gente de buena voluntad que ha querido ayudarle; que después que su hijo murió ha sufrido mucho, pero que en el pueblo donde vive hay mucha gente caritativa, mucha gente buena, que le ha ayudado y ha podido vivir.

El décimoctavo error consiste en haber permitido la corte inferior, no obstante la oposición y objeción de la demandada, que se presentara evidencia en cuanto a la edad del fallecido Juan López y su estado de salud.

Se señala también como décimonoveno error la indemnización de $1,500 concedida a Sandalio López. La teoría de la demandada apelante es que ''en estos casos la más corta esperanza de vida del demandante es la que debe tomarse en cuenta al determinar los daños y perjuicios, y no la esperanza de vida del interfecto, quien por ser más joven que el demandante tenía probablemente más esperanza de vida.'' Precisamente por estas razones es que no nos explicamos que se señale como error la admisión de una prueba que no perjudica a la demandada, cuando la corte inferior demuestra claramente en su fallo que no tuvo en cuenta dicha prueba,

ajustándose a la teoría que invoca la parte demandada. En su opinión el tribunal sentenciador se expresa como sigue:

"Ahora bien, teniendo en cuenta la edad avanzada en que frisa el causante (sic) o sea el demandante en este caso y las pocas necesidades que tiene por el medio en que ha venido viviendo y vive, la corte cree que una indemnización de $1,500 sería justa, razonable y adecuada."

Queremos hacer constar que no estamos declarando que la evidencia resulte inadmisible, sino que en nada ha perjudicado a la apelante. En cuanto a la cuantía de la indemnización, nos inclinamos a respetar el criterio del tribunal juzgador.

El vigésimo error se basa en no haberse permitido a la demandada preguntar al demandante Angel Cabán Santiago si había rendido planillas de *income tax*. Esta pregunta, según la demandada, se formuló con el propósito de impugnar la veracidad del testigo. Declaró el demandante que el *truck* le producía $325 brutos mensuales y como $140 netos. Dijo además que es casado, que tiene dos hijos, que no estuvo empleado durante los cuatro meses en que se vió privado de los servicios de su *truck* y que únicamente era su familia quien le ayudaba. Siendo ello así no estaba obligado a rendir planillas de *income tax* porque de acuerdo con la ley viene obligado a prestar una declaración bajo juramento demostrando específicamente las partidas de su ingreso bruto y las deducciones y créditos admisibles, todo individuo que tenga un ingreso neto por el año contributivo de $2,500 o más, si es casado y vive con su consorte. Ley núm. 74 de 6 de agosto de 1925, pág. 401, sec. 24. De acuerdo con la prueba Angel Cabán Santiago tiene un ingreso neto menor de $2,500. La resolución de la corte negándose a permitir que se interrogara al testigo sobre si había rendido planillas no pudo ocasionar perjuicio a la parte demandada.

El vigésimo primero error consiste en haber sostenido la corte inferior que el demandante Angel Cabán Santiago sufrió daños y perjuicios en la suma de $160 por el tér-

mino que dejó de utilizar el *truck*. Arguye la apelante que de la propia declaración del demandante se deduce que al mes de haber pagado el importe de la reparación le devolvieron el *truck*. Según manifiesta el demandante Angel Cabán Santiago el carro estuvo un mes en el garage sin hacérsele reparación alguna, porque le dijeron que si no entregaba $100 no podían empezar las reparaciones; que consiguió esa suma entre sus familiares y cuando la satisfizo comenzaron los trabajos de reparación, entregándosele el *truck* un mes más tarde. La corte *a quo* concedió daños por dos meses a razón de $80 mensuales. Si Angel Cabán Santiago carecía de dinero para satisfacer la suma que se le exigía por adelantado para la reparación del *truck,* no puede ser responsable del tiempo transcurrido antes de iniciarse el trabajo. Es verdad que la parte perjudicada debe hacer todo lo posible para reducir los daños que se hayan causado, es decir, debe hacer todo lo que esté razonablemente a su alcance para que los daños no aumenten. No se puede pedir, sin embargo, de una persona que anticipe que su propiedad va a recibir un daño y que se prepare para hacer frente a los gastos que pueda irrogarle la reparación de esa propiedad. El demandante hizo lo que cualquier hombre prudente hubiera hecho bajo las mismas circunstancias (17 C.J. 776), si se tiene en cuenta que vivía de las ganancias de su *truck* y que para conseguir los $100 que se le exigían tuvo que acudir a sus familiares. Debe desestimarse el error apuntado.

El vigésimo segundo error se basa en haberse admitido, con la oposición de la demandada, evidencia en cuanto al tratamiento y prescripción facultativa del demandante Angel Cabán Santiago. Se trata de $25 satisfechos como honorarios al médico y $15 que importaron las medicinas. Debe desestimarse el error apuntado.

El vigésimo tercero error consiste en haber concedido la corte al demandante Angel Cabán Santiago la cantidad de $300 como compensación razonable por los sufrimientos físicos, mentales y morales. La apelante admite que el deman-

dante tuvo sufrimientos físicos, pero no cree que una simple contusión en una pierna pueda producir sufrimientos morales o mentales de especie alguna. La evidencia, a su juicio, no demuestra que el demandante recibiera una lesión corporal de tal naturaleza que le pudiera preocupar mental o moralmente. En la demanda se alega que las lesiones inferidas al demandante le produjeron grandes dolores y sufrimientos físicos y morales, y se demostró por el testimonio del Dr. Cardona que Angel Cabán Santiago recibió contusiones en la rodilla izquierda, laceraciones en el dorso de su mano derecha y contusiones en el pecho, que de primera intención esas contusiones parecían que eran comparativamente leves, pero que la contusión que recibió en la rodilla le produjo una inflamación de la bursa que cubre la patela y que el demandante, que es de Camuy, volvió a Aguadilla a la semana debido a la inflamación de la rodilla, siendo necesario inmobilizar la pierna y restringirle los movimientos de la rodilla como por un mes al efecto que bajase la inflamación sinovial que tenía; que hubo que ponerle un vendaje de yeso, quitárselo y volvérselo a poner; que estuvo viniendo por tres o cuatro veces de Camuy; que un derrame sinovial es doloroso; que tarda algunos días para desarrollarse porque se va inflamando poco a poco; que el demandante tenía golpes en el lado derecho del pecho, en la parte externa del lado derecho y la severa contusión de la rodilla; que le prescribió un calmante para los dolores en los primeros días, que es cuando están más fuertes; que después que curó al lesionado se fué para su casa en Camuy y que volvió a la semana con la inflamación de la rodilla. Esta es, en síntesis, la prueba contenida en el testimonio del Dr. Cardona.

No hay duda de que la angustia mental puede ser tenida en cuenta como elemento de daño cuando es una consecuencia directa y necesaria de la lesión física. *McDermott* v. *Severe*, 202 U.S. 600, 611. Algunos tribunales sostienen que es difícil, si no imposible, establecer una línea divisoria, entre sufrimientos físicos y sufrimientos mentales. *Baisdrenghien*

v. *Missouri, etc. R. Co.,* 91 Kan. 730, 139 P. 428; *Western Union Tel. Co.* v. *Rogers,* 68 Miss. 748, 9 So. 823. Otros consideran el sufrimiento como una emoción mental derivada de la lesión física. "Es la mente", se ha dicho, "la que siente o se da cuenta del dolor físico y por lo tanto existe angustia mental o sufrimiento inseparable de la lesión física, a menos que la mente quede anonadada y se produzca un estado de inconsciencia." *Indianapolis, etc. R. Co.* v. *Stables,* 62 Ill. 313, 320. En este caso no es necesario que esta corte fije la regla a seguir, porque la corte inferior ha concedido $300 de indemnización que no son excesivos de acuerdo con la prueba practicada aun cuando queden descartados los sufrimientos mentales. Por estas razones entendemos que debemos aceptar la indemnización que fija en su sentencia el tribunal·juzgador.

Alega por último la apelante que la corte inferior erró al condenarla a satisfacer costas, gastos y honorarios de abogado. Entendemos que debemos aceptar el pronunciamiento del tribunal *a quo* en el ejercicio de sus facultades discrecionales.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado señor Travieso no intervino.